# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP1055 |
| COMPLETE TITLE: | Lela M. Operton, |
| | Plaintiff-Appellant, |
| | v. |
| | Labor and Industry Review Commission, |
| | Defendant-Respondent-Petitioner, |
| | Walgreen Co. Illinois, |
| | Defendant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
369 Wis. 2d 166, 880 N.W.2d 169
(2016 WI App 37 – Published)

| | |
|---|---|
| OPINION FILED: | May 4, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 10, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | John C. Albert |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ABRAHAMSON, J. concurs, joined by BRADLEY, A. W., J. (opinion filed). |
| | ZIEGLER, J. concurs (opinion filed). |
| | BRADLEY, R. G., J. concurs, joined by GABLEMAN, J. and KELLY, J. (opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-petitioner, there was a brief by *William Sherlin Sample* and *Labor & Industry Review Commission,* Madison, and oral argument by *William Sherlin Sample*

For the plaintiff-appellant, there was a brief by *Marilyn Townsend*, and *Law Offices of Marilyn Townsend,* Madison, and oral argument by *Marilyn Townsend.*

For *Amicus Curiae* Wisconsin Employment Lawyers Association, a brief was filed by *Victor Forberger*, Madison.

For *Amicus Curiae* Wisconsin State AFL-CIO, a brief was filed by *Matthew R. Robbins, Sara J. Geenen* and *The Previant Law Firm*, Milwaukee.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP1055
(L.C. No. 2014CV3050)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Lela M. Operton,**

      **Plaintiff-Appellant,**

  **v.**

**Labor and Industry Review Commission,**

      **Defendant-Respondent-Petitioner,**

**Walgreen Co. Illinois,**

      **Defendant.**

**FILED**

**MAY 4, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed and cause remanded.*

¶1   PATIENCE DRAKE ROGGENSACK, C.J.   This is a review of a published decision of the court of appeals[1] reversing a circuit court order that affirmed a determination by the Labor and Industry Review Commission (LIRC).[2]   LIRC determined that Lela Operton (Operton) was ineligible for unemployment benefits because she was terminated for substantial fault.

---

[1] Operton v. LIRC, 2016 WI App 37, 369 Wis. 2d 166, 880 N.W.2d 169.

[2] The Honorable John C. Albert of Dane County presided.

¶2 We conclude that LIRC incorrectly denied Operton unemployment benefits. Operton was entitled to unemployment benefits because her actions do not fit within the definition of substantial fault as set forth in Wis. Stat. § 108.04(5g)(a)(2013-14)[3]. Stated more fully, Operton was terminated for committing "One or more inadvertent errors" during the course of her employment, and therefore pursuant to Wis. Stat. § 108.04(5g)(a)2., she was not terminated for substantial fault. We further conclude that, as a matter of law, Operton's eight accidental or careless cash-handling errors over the course of 80,000 cash-handling transactions were inadvertent.

¶3 Accordingly, we affirm the court of appeals and remand to LIRC to determine the amount of unemployment compensation Operton is owed.

## I. BACKGROUND

¶4 The following undisputed facts, unless otherwise noted, are based on the findings of the Department of Workforce Development's (DWD) administrative law judge (ALJ) that LIRC adopted. From July 17, 2012 to March 24, 2014, Operton worked as a full-time service clerk for Walgreens. Operton's employment sometimes entailed more than one hundred cash-handling transactions in a day during the twenty months she was

---

[3] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

employed full-time by Walgreens.   She completed an estimated 80,000 cash-handling transactions[4] throughout her employment.

¶5   During her period of employment, Operton made various cash-handling errors.   First, on October 19, 2012, Operton accepted a Women, Infants, and Children (WIC) check for $8.67 when the check should have been for $5.78.   As a result, Walgreens lost $2.89 and gave Operton a verbal warning as punishment for her mistake.

¶6   Next, on February 12, 2013, Operton accepted a WIC check for $14.46, but did not get the customer's signature on the check.   On March 6, 2013, she gave a $16.73 check back to a customer, and Walgreens suffered a $16.73 monetary loss as a result.   Walgreens was unable to process these two checks and gave Operton a written warning for these two errors.

¶7   A few months later, Operton took a WIC check for $27.63 before the date on which it was valid.   Walgreens was unable to process the check, and Operton received a final written warning.

¶8   On January 1, 2014, Operton returned a WIC check for $84.95 back to a customer that the customer had tried to use to purchase $84.95 worth of goods.   Walgreens suffered a monetary loss of $84.95 because of this error and gave Operton an additional final written warning.   And, on January 29, 2014, Operton received another final written warning as well as a two-

---

[4] Neither side disputes that this is roughly the number of cash-handling transactions that Operton completed.

day suspension after she accepted a check for $6.17 even though it was valid for $6.00, thereby causing Walgreens to lose seventeen cents. Soon after, a customer attempted to pay for $9.26 worth of items using a food share debit card, but the customer left the store without completing the transaction on the pin pad, which caused Walgreens to suffer a monetary loss of $9.26. Operton was issued another final written warning, which stated that any additional cash-handling errors would lead to her termination.

¶9 Furthermore, on March 22, 2014, Operton allowed a customer to use a credit card to purchase $399.27 worth of items, but did not check the customer's identification in violation of Walgreen's policy that employees must check a customer's identification on credit card purchases over $50. As a result, Walgreens suffered a monetary loss of $399.27. Walgreens later found out that the credit card was stolen when a manager was contacted by police.

¶10 As a result, on March 24, 2014, Walgreens terminated Operton's employment. Walgreens indicated that Operton was terminated due to multiple cash-handling errors as well as her inability to improve despite the accompanying warnings. Walgreens did not contend that any of Operton's errors were intentional or malicious.

¶11 After being terminated, Operton filed for unemployment benefits. Walgreens contested her request and contended that she was terminated due to an inability to perform her job. And,

initially, the DWD denied Operton unemployment benefits based on misconduct.

¶12 Operton appealed and an ALJ for the DWD held an evidentiary hearing. At the hearing, the ALJ concluded that Operton was ineligible for unemployment benefits. The ALJ found that there was "no evidence that the employee intentionally or willfully disregarded the employer's interests by continuing to make cash-handling errors. Additionally, her actions were not so careless or negligent so as to manifest culpability or wrongful intent."[5] Accordingly, the ALJ concluded that Operton had not committed "misconduct connected with her employment."[6]

¶13 However, the ALJ denied Operton unemployment benefits and concluded that Operton was terminated for substantial fault. The ALJ reasoned that Operton "did not dispute that the transactions for which she was given disciplinary action occurred, nor did she provide any testimony to establish that she did not have reasonable control over the actions that led to her discharge. She was aware of the employer's policies, including the cash-handling and WIC check procedures, but continued to make cash-handling errors resulting in actual financial loss to the employer, after receiving multiple warnings."[7]

---

[5] In the matter of Lela Operton, Hearing No. 14001606MD (June 4, 2014).

[6] Id.

[7] Id.

¶14  On September 19, 2014, LIRC adopted the findings and conclusions of the ALJ.  Referring to the instance in which Operton failed to check an individual's identification when processing a credit card payment, LIRC stated:  "This major infraction, taken together with the final warning regarding earlier cash transactions, persuades the commission that the employee's discharge was due to substantial fault."[8]

¶15  The circuit court affirmed LIRC's decision.  In doing so, the circuit court deferred to LIRC in its entirety.

¶16  The court of appeals set aside LIRC's decision.  The court concluded that LIRC "erred in its construction and application of 'substantial fault' to the facts presented."[9]  The court of appeals reasoned that LIRC was owed no deference, and therefore de novo review was appropriate.  Next, the court concluded, consistent with Wis. Stat. § 108.04(5g)(a), that an employee's multiple errors do not automatically transform the errors from inadvertent into intentional.[10]

¶17  This court granted LIRC's petition for review.  We now affirm the court of appeals and remand to LIRC to determine the amount of unemployment compensation Operton is owed.

---

[8] Lela Operton v. Walgreen Co., ERD No. 14001606MD (LIRC, September 19, 2014).

[9] Operton, 369 Wis. 2d 166, ¶1.

[10] Id., ¶32.

## II.    DISCUSSION

### A.    Standard of Review

¶18    "When there is an appeal from a LIRC determination, we review LIRC's decision rather than the decision of the circuit court."  Masri v. LIRC, 2014 WI 81, ¶20, 356 Wis. 2d 405, 850 N.W.2d 298.  "LIRC's findings of fact are upheld if they are supported by substantial and credible evidence."  Brauneis v. LIRC, 2000 WI 69, ¶14, 236 Wis. 2d 27, 612 N.W.2d 635 (citing Hagen v. LIRC, 210 Wis. 2d 12, 23, 563 N.W.2d 454 (1997)).

¶19    In contrast, this court is "not bound by an agency's interpretation of a statute."  Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995).  However, "depending on the circumstances, an agency's interpretation of a statute is entitled to one of the following three levels of deference: great weight deference, due weight deference or no deference." Cty. of Dane v. LIRC, 2009 WI 9, ¶14, 315 Wis. 2d 293, 759 N.W.2d 571.

¶20    "Which level is appropriate 'depends on the comparative institutional capabilities and qualifications of the court and the administrative agency.'"  UFE Inc. v. LIRC, 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996) (quoting State ex rel. Parker v. Sullivan, 184 Wis. 2d 668, 699, 517 N.W.2d 449 (1994)).  "Our basis for giving even due weight deference to an agency's statutory interpretation is bottomed on two required assumptions:  the statute is one that the agency was charged with administering and the agency has at least some expertise in the interpretation of the statute in question."  Racine Harley-

Davidson, Inc. v. Wis. Div. of Hearings & Appeals, 2006 WI 86, ¶107, 292 Wis. 2d 549, 717 N.W.2d 184 (Roggensack, J., concurring).

¶21 "In according due weight deference, we defer to an agency's statutory interpretation only when we conclude that another interpretation of the statute is not more reasonable than that chosen by the agency." Id., ¶105. As such, under due weight deference, the court is tasked with determining whether there is a more reasonable interpretation of the statute. "In order to decide that question, we make a comparison between the agency's interpretation and alternate interpretations. This comparison requires us to construe the statute ourselves." Id.

¶22 "We note here that there is little difference between due weight deference and no deference, since both situations require us to construe the statute ourselves. In so doing, we employ judicial expertise in statutory construction, and we embrace a major responsibility of the judicial branch of government, deciding what statutes mean." Cty. of Dane, 2009 WI 9, ¶19 (internal quotations omitted).

¶23 In the present case, the level of deference we afford LIRC is inconsequential as LIRC did not provide an articulated interpretation of Wis. Stat. § 108.04 in denying Operton unemployment benefits.[11] LIRC adopted the conclusions of the

_____

[11] It is not entirely clear what role the substance of an agency's interpretation does or should play in determining the level of deference. Many of our cases discussing the levels of deference focus not on the presence or substance of an agency's interpretation; rather, they focus on the institutional

(continued)

8

DWD's ALJ.  But the ALJ did not describe its interpretation of the statute at issue, Wis. Stat. § 108.04(5g)(a).

¶24 Specifically, there are three types of actions exempted from the definition of substantial fault.  However, the ALJ concluded that Operton's conduct did not fall within any of these categories without reasoning through each provision individually.  Importantly, the ALJ never examined Operton's errors to determine if the errors were "inadvertent" under Wis. Stat. § 108.04(5g)(a)2.[12]  The ALJ stated that "Operton was aware of the employer's policies, including the cash-handling and WIC check procedures, but continued to make cash-handling errors resulting in financial loss to the employer, after receiving

---

capabilities of the agency as well as factors that pertain to the nature of the legal issue before the court.  For this reason, perhaps our standard of review analysis in cases involving an agency's interpretation of a statute should include a threshold determination of whether the agency has articulated its interpretation of the statute.  If the agency has not provided the court with an articulated interpretation of the statute, then the level of deference the agency is afforded is not at issue; we simply interpret and apply the statute. However, if the agency provided an articulated interpretation of the statute, we would proceed under our well-established framework to determine the level of deference to which the agency is entitled.  Such a requirement seems intuitive. Nevertheless, we need not address this tension for purposes of the present case.

[12] As discussed more in depth below, Wis. Stat. § 108.04(5g)(a)2. exempts inadvertent errors by an employee from the type of conduct included in substantial fault.

multiple warnings."[13] It is unclear which prong of Wis. Stat. § 108.04(5g)(a) the ALJ was considering.

¶25 LIRC's decision adopting the findings and conclusions of the ALJ provided no clarification. Importantly, LIRC also did not discuss whether the errors that Operton committed were inadvertent and therefore a type of error exempted from the definition of substantial fault. LIRC merely stated:

> The employee did not offer any explanation for not checking the ID which would lead the commission to conclude that she lacked the ability to conform her conduct to the employer's reasonable requirement to check ID for large credit card transactions. This major infraction, taken together with the final warning regarding earlier cash transactions, persuades the commission that the employee's discharge was due to substantial fault.[14]

Absent from this reasoning is any discussion of "inadvertent errors" or the conduct the legislature explicitly exempted from the definition of substantial fault.

¶26 Accordingly, LIRC did not provide an articulated interpretation of the statute that it then applied. As such, whether we afford LIRC due weight deference or no deference is of no consequence. See deBoer Transp., Inc. v. Swenson, 2011 WI 64, ¶36, 335 Wis. 2d 599, 804 N.W.2d 658 ("However, we agree with the court of appeals that we need not decide the applicable

---

[13] In the matter of Lela Operton, Hearing No. 14001606MD (June 4, 2014).

[14] Lela Operton v. Walgreen Co., ERD No. 14001606MD (LIRC, September 19, 2014).

10

standard of review here because LIRC's statutory interpretation and application is unreasonable, and therefore, it will not withstand any level of deference." (citation omitted)). Therefore, we interpret Wis. Stat. § 108.04 under well-established principles of statutory interpretation to clearly explain the law.

### B. Statutory Interpretation, General Principles

¶27 It is axiomatic that "the purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. "We assume that the legislature's intent is expressed in the statutory language." Id. For this reason, "statutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" Id., ¶45 (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id., ¶45.

¶28 "Context is important to meaning." Id., ¶46. Accordingly, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id. (citations omitted).

11

¶29 Moreover, we need not consult extrinsic sources of interpretation if there is no ambiguity in the statute. Id. And, "a statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses." Id., ¶47 (citing Bruno v. Milwaukee Cty., 2003 WI 28, ¶19, 260 Wis. 2d 633, 660 N.W.2d 656). After all, "the court is not at liberty to disregard the plain, clear words of the statute." Id. (quoting State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)).

¶30 These principles guide our interpretation and application of Wis. Stat. § 108.04 in the present case.

C. LIRC'S Interpretation of Wis. Stat. § 108.04(5g)

¶31 Wisconsin's unemployment compensation statutes embody a strong public policy in favor of compensating the unemployed. This policy is codified in Wis. Stat. § 108.01, which provides: "In good times and in bad times unemployment is a heavy social cost, directly affecting many thousands of wage earners. Each employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing benefits for its own unemployed workers." Wis. Stat. § 108.01(1).

¶32 Consistent with this policy, Wis. Stat. ch. 108 is "liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status." Princess House, Inc. v. DILHR, 111 Wis. 2d 46, 62, 330 N.W.2d 169 (1983).

12

¶33 Nevertheless, not all employees are entitled to unemployment benefits.  Under Wis. Stat. § 108.04, an individual may be disqualified from receiving unemployment benefits.

¶34 In 2013, the legislature changed the standard an employer must meet to disqualify an employee from receiving benefits.  The legislative amendment created a two-tier system for determining when an employee is disqualified from receiving unemployment benefits.  See Wis. Stat. § 108.04(5) & (5g).  The first tier, disqualification for misconduct, existed prior to these amendments and is codified in § 108.04(5).  This provision operates to prevent any employee discharged for misconduct from obtaining unemployment benefits.  The legislature defined misconduct as:

> one or more actions or conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which an employer has a right to expect of his or her employees, or in carelessness or negligence of such degree or recurrence as to manifest culpability, wrongful intent, or evil design of equal severity to such disregard, or to show an intentional and substantial disregard of an employer's interests, or an employee's duties and obligations to his or her employer.

§ 108.04(5).  The statute then provides examples of several actions that constitute misconduct.  § 108.04(5)(a)-(g).  If an employee is terminated as a result of any of the statutorily delineated actions or under the general definition of misconduct, then the employee's termination was for misconduct, and the employee is ineligible for unemployment benefits.

13

¶35 After the legislative amendments to the unemployment benefits statutes in 2013,[15] an employee who has not committed misconduct may nevertheless be ineligible for unemployment compensation.  Stated otherwise, when an employee's conduct does not rise to the level of misconduct, the employee may be denied unemployment benefits if the employee was terminated for substantial fault.  See Wis. Stat. § 108.04(5g).  The statute provides:

> An employee whose work is terminated by an employing unit for substantial fault by the employee connected with the employee's work is ineligible to receive benefits until 7 weeks have elapsed since the end of the week in which the termination occurs and the employee earns wages after the week in which the termination occurs equal to at least 14 times the employee's weekly benefit rate under s. 108.05(1) in employment or other work covered by the unemployment insurance law of any state or the federal government. For purposes of requalification, the employee's benefit rate shall be the rate that would have been paid had the discharge not occurred.

§ 108.04(5g)(a).

¶36 Wisconsin Stat. § 108.04(5g) defines substantial fault broadly.  It includes "acts or omissions of an employee over which the employee exercised reasonable control and which violate reasonable requirements of the employee's employer." Id.  However, the legislature did not disqualify every employee who commits such errors from receiving unemployment benefits.

---

[15] Though enacted in 2013, these amendments became effective on January 5, 2014.

¶37 Instead, the legislature provided three types of conduct that are explicitly exempt from the definition of substantial fault. Under the statute, substantial fault does not include:

> 1. One or more minor infractions of rules unless an infraction is repeated after the employer warns the employee about the infraction.

> 2. One or more inadvertent errors made by the employee.

> 3. Any failure of the employee to perform work because of insufficient skill, ability, or equipment.

Wis. Stat. § 108.04(5g)(a). Accordingly, if an employee is terminated for conduct that falls within any of the types of actions described by the legislature in para. (a), an employee's termination was not due to the "substantial fault" of the employee. § 108.04(5g)(a)1-3.

¶38 The burden is on the employer to show that the termination was due to the substantial fault of the employee. This is consistent with our past cases interpreting the unemployment benefits statutes in which we have held that "the party (the employer here) resisting payment of benefits has the burden of proving that the case comes within the disqualifying provision of the law. . . ." Brauneis, 236 Wis. 2d 27, ¶22; see also Consolidated Const. Co., Inc. v. Casey, 71 Wis. 2d 811, 820, 238 N.W.2d 758 (1976) (reasoning the burden is on the employer to show that "some disqualifying provision . . . should bar the employee's claim." (citing Kansas City Star Co. v. ILHR Dep't, 60 Wis. 2d 591, 602, 211 N.W.2d 488 (1973)).

15

¶39 Each of the provided-for exceptions are similar in nature insofar as they remove a type of conduct from what is considered substantial fault. Specifically, the statute exempts from the definition of substantial fault conduct that suggests the employee was prone to accidental errors or simply unable to adequately perform his or her job.

¶40 A review of the three types of actions the legislature exempted from substantial fault gives context to the definition of substantial fault. Wisconsin Stat. § 108.04(5g)(a)1. removes minor infractions from the type of conduct that is substantial fault, unless the employee had previously been warned about the infraction. An analysis of the proposed changes by the DWD states that this exception was intended to exempt "[m]inor violations of rules unless employee repeats the violation after receiving a warning." Department of Workforce Development, Analysis of Proposed UI Law Change, D12-01 (October 24, 2012). As such, employees who are terminated for a repetitive type of minor violation are not at substantial fault for their termination. If, however, the employee is warned about minor violations of an employer's rules and continues to commit the same violation, then the employee's termination may be due to the substantial fault of the employee.

¶41 Likewise, Wis. Stat. § 108.04(5g)(a)3. provides that an employee was not at substantial fault for his or her termination if the employee was incapable of performing the work the employment required. By its plain language, this provision

16

includes employees who are terminated for a lack of skill as well as employees who are not able to master job performance.

¶42 Operton does not contend that her conduct is exempt from substantial fault under either Wis. Stat. § 108.04(5g)(a)1. or § 108.04(5g)(a)3. Rather, Operton contends that her conduct does not fall within the definition of substantial fault because the errors for which she was discharged were "inadvertent" errors.

¶43 Accordingly, at issue in the present case is LIRC's interpretation of Wis. Stat. § 108.04(5g)(a)2., which exempts from substantial fault, "One or more inadvertent errors made by the employee." As discussed above, LIRC's decision contains no articulated interpretation of this subparagraph. Accordingly, we determine the proper meaning of the statutory provision in order to apply the law.

¶44 Under Wis. Stat. § 108.04(5g)(a)2., an employee's termination is not for substantial fault if the termination resulted from one or more inadvertent errors. Inadvertence is defined as "[a]n accidental oversight; the result of carelessness." Inadvertence, Black's Law Dictionary, 827 (9th ed. 2009); see also Queen Ins. Co. of America v. Kaiser, 27 Wis. 2d 571, 577, 135 N.W.2d 247 (1965) (concluding that "an inadvertent act of omission" was only "passive negligence" or "the failure to do something that should have been done"). The DWD's comment about these substantial fault provisions explained that this paragraph exempts "[u]nintentional mistakes made by the employee" from the definition of substantial fault.

17

Department of Workforce Development, Analysis of Proposed UI Law Change, D12-01 (October 24, 2012). Consequently, the words of the statute require courts to examine the circumstances surrounding an employee's error to determine if it was careless or unintentional.[16]

¶45 It is important to view Wis. Stat. § 108.04(5g)(a)2. in context to ascertain the types of conduct to which it applies. Notably, § 108.04(5g)(a)1. makes a distinction that § 108.04(5g)2. does not. Specifically, § 108.04(5g)(a)1. provides that one or more minor infractions does not constitute substantial fault unless an infraction is repeated and the employer has previously warned the employee about the infraction. In contrast, § 108.04(5g)(a)2. contains a different definition. There, an employer's warning is not dispositive of whether errors were inadvertent under § 108.04(5g)(a)2. That is not to say an employer's warning can never be relevant to whether an employee's error was inadvertent. However, an employee who is warned about an inadvertent error is not necessarily terminated for substantial fault even if the employee subsequently makes another error.

¶46 Finally, the statute does not state whether there is a limitation on the number of inadvertent errors an employee may commit before the employee's errors are no longer inadvertent.

---

[16] This definition of inadvertent is not inconsistent with the way in which the court of appeals defined inadvertent in Easterling v. LIRC, 2017 WI App 18, ___ Wis. 2d ___, ___ N.W.2d ___.

18

However, we need not determine if a numerical limit exists. Under the facts of this case, it suffices to interpret the statute to mean that multiple inadvertent errors, even if the employee has been warned about the errors, does not necessarily constitute substantial fault.

### D. Application of Wis. Stat. § 108.04(5g)

¶47 In the present case, we must determine whether Operton's errors are exempted from the statutory definition of substantial fault. Specifically, we must determine whether Operton was terminated by Walgreens for "one or more inadvertent errors" during the course of her employment. We conclude that she was, and therefore her actions are exempted from the definition of substantial fault, and she is entitled to unemployment compensation.

¶48 At the outset, we note that LIRC's findings of fact within its misconduct analysis support our conclusion. LIRC found that none of Operton's errors was intentional or willful. Specifically, LIRC found that "there is no evidence that the employee intentionally or willfully disregarded the employer's interests by continuing to make cash handling errors."[17] Moreover, LIRC also found that Operton's "actions were not so careless or negligent so as to manifest culpability or wrongful intent."[18] As discussed below, there is nothing in the record

---

[17] Lela Operton v. Walgreen Co., ERD No. 14001606MD (LIRC, September 19, 2014) (adopting DWD administrative law judge's findings).

[18] Id.

19

that suggests these findings are erroneous. Accordingly, LIRC's factual findings support our conclusion that Operton's conduct falls within the "one or more inadvertent errors" provision, and therefore was the type of conduct the legislature exempted from the definition of substantial fault.

¶49 However, despite these findings, LIRC concluded that Operton was not entitled to unemployment compensation because she was terminated from Walgreens for substantial fault.[19] LIRC cited Operton's eight cash-handling errors and reasoned that she was aware of Walgreen's procedures but continued to make errors.

¶50 However, Operton's eight cash-handling errors were not so egregious as to warrant the conclusion that the errors were transformed from inadvertent to reckless or intentional under the facts of this case. Her errors occurred over a 21-month time period when Operton completed approximately 80,000 cash-handling transactions. Accordingly, we conclude that Operton's eight accidental or careless errors were, as a matter of law, "inadvertent errors" because Operton made these errors over the course of 80,000 cash-handling transactions during a 21-month period.

¶51 The length of time between Operton's errors supports this conclusion. Operton went months without making an error.

---

[19] We agree with LIRC that Operton's actions fall within the general definition of substantial fault before the exceptions are considered. Operton exercised reasonable control over the cash-handling transaction, and Walgreens' expectation that she handle such transactions properly was reasonable.

For example, after Operton's cash-handling error on October 19, 2012, she did not commit another error until February 12, 2013. Likewise, after her cash-handling error on July 26, 2013, she did not commit another error until January 1, 2014. Therefore, there were substantial periods of time in which Operton performed the duties of her job error-free.

¶52 Moreover, Operton was not repeatedly making the same error.[20] Yes, the errors were similar in nature; all of the errors were cash-handling mistakes. Yet, for the most part, Operton violated different rules or procedures each time. Operton's first error occurred when she accepted a WIC check for $8.67 worth of items even though the check was worth only $5.78. Operton committed a different type of error when she accidently gave a check back to a customer who had made a purchase for which the check was to serve as payment. This was the only time during her employment when she made this type of error. And, on a different occasion, a customer left without finishing the transaction on the pin pad. Again, this was not an error Operton made more than once. Finally, the error that she was ultimately terminated for—not checking identification of an individual using a credit card for a purchase over $50—was a different type of error than those she had previously made.

---

[20] It is worth noting that LIRC found that Operton was a conscientious employee, and her supervisor offered to serve as a reference for her following her termination from Walgreens.

21

¶53 Accordingly, the length of Operton's employment, the number of transactions Operton handled throughout her employment, and the variety of the errors she committed compels the conclusion that she was not terminated from Walgreens for substantial fault. While all of the errors fell within the same general cash-handling duties of her employment, the errors were, nevertheless, inadvertent.

¶54 Consequently, as a matter of law, Operton's errors are the type of conduct the legislature intended to exempt from substantial fault.[21] And, as a result, the LIRC improperly denied Operton unemployment benefits.

### III. CONCLUSION

¶55 In light of the foregoing, we conclude that LIRC incorrectly denied Operton unemployment benefits. Operton was entitled to unemployment benefits because her actions did not fit within the definition of substantial fault as set forth in Wis. Stat. § 108.04(5g). Stated more fully, Operton was terminated for committing "One or more inadvertent errors" during the course of her employment, and therefore pursuant to Wis. Stat. § 108.04(5g)(a)2., she was not terminated for substantial fault. We further conclude that, as a matter of law, Operton's eight accidental or careless cash-handling errors

---

[21] We leave open whether there is a point at which the number of errors that seem inadvertent in isolation cease to be inadvertent when viewed in their totality. Because we conclude that, under the facts of this case, Operton's eight errors were inadvertent, we need not reach this issue.

over the course of 80,000 cash-handling transactions were inadvertent.

¶56 Accordingly, we affirm the court of appeals and remand to LIRC to determine the amount of unemployment compensation Operton is owed.

*By the Court.*—The court of appeals is affirmed, and the cause is remanded to the Labor and Industry Review Commission.

¶57 SHIRLEY S. ABRAHAMSON, J. *(concurring).* Wisconsin was the first state in the nation to have an unemployment compensation law.[1] We should get this decision right.

¶58 I agree with the court's mandate. The employer has the burden of proving that Lela Operton is not eligible for unemployment benefits. It has not met this burden. Lela Operton wins.

¶59 I do not join the majority opinion for two principal reasons: (1) This is a "no deference" case.[2] (2) The majority opinion injects extra-statutory considerations into its analysis of Wis. Stat. § 108.04(5g)(a)2.

(1)

¶60 This is a "no deference" case. The court of appeals got it right: De novo review is appropriate because LIRC "is applying a new statute to a new concept." Operton v. LIRC, 2016 WI App 37, ¶20, 369 Wis. 2d 166, 880 N.W.2d 169.[3] This court

---

[1] See Brief of Amicus Curiae Wisconsin State AFL-CIO; Brief of Amicus Curiae Wisconsin Employment Lawyers Association.

[2] I have difficulty with footnote 12 of the majority opinion. I do not understand the nature and scope of the majority opinion's reference to the "facts that pertain to the nature of the legal issue" or to the "substance of an agency's interpretation," which it refers to as a "threshold question." Nothing suggestive of this remark has been raised or briefed in the instant case.

[3] See also Racine Harley-Davidson, Inc. v. State, Div. of Hearings & Appeals, 2006 WI 86, ¶20, 292 Wis. 2d 549, 565-66, 717 N.W.2d 184 (footnotes omitted):

> Thus, due weight deference and no deference to an agency's interpretation of a statute are similar.

(continued)

1

independently decides how to interpret Wis. Stat. § 108.04(5g)(a)2. Regardless of the deference issue, LIRC erred.

(2)

¶61 The majority opinion's analysis of Wis. Stat. § 108.04(5g)(a)2. significantly strays from the statutory text. It injects two extra-statutory considerations into its analysis of § 108.04(5g)(a)2.

¶62 The first statutory misstep is that the majority opinion adds the idea of a "warning" to Wis. Stat. § 108.04(5g)(a)2. The court of appeals got it right, concluding that "[t]he ALJ and LIRC erred in merging the 'warning' component set forth in the 'infraction' exception in § 108.04(5g)(a)1. with the 'inadvertent error' exception in § 108.04(5g)(a)2. . . . . Inadvertent errors, warnings or no warnings, never meet the statutory definition of substantial fault." Operton, 369 Wis. 2d 166, ¶¶24, 28.

---

Under both due weight deference and no deference, the reviewing court may adopt, without regard for the agency's interpretation, what it views as the most reasonable interpretation of the statute. When due weight deference is accorded an agency, however, a reviewing court will not reverse the agency's statutory interpretation when an alternative interpretation is equally reasonable. In contrast, in a no deference review of an agency's statutory interpretation, the reviewing court merely benefits from the agency's determination and may reverse the agency's interpretation even when an alternative statutory interpretation is equally reasonable to the interpretation of the agency.

2

¶63 Although the majority opinion concedes that the "inadvertent errors" language in § 108.04(5g)(a)2. (in contrast with the language in § 108.04(5g)(a)1.)[4] contains no language regarding warnings to employees, the majority opinion tells readers, with a straight face, that "an employer's warnings" are "relevant" in § 108.04(5g)(a)2. Majority op., ¶45.

¶64 I agree with Judge Lundsten's concurrence in the court of appeals: "Warnings are not relevant under the 'inadvertent errors' alternative." Operton, 369 Wis. 2d 166, ¶45 (Lundsten, J., concurring).

¶65 The second statutory misstep occurs when the majority opinion "leave[s] open whether there is a point at which the number of errors that seem inadvertent in isolation cease to be inadvertent when viewed in their totality. . . ." Majority op., ¶54 n.21. By reserving this question, and thus including this extra-statutory consideration in its analysis, see majority op., ¶¶51-53, the majority opinion once again performs a statutory analysis that is not tethered to the statutory language.

---

[4] Compare Wis. Stat. § 108.04(5g)(a)1. (Substantial fault does not include "[o]ne or more minor infractions of rules unless an infraction is repeated after the employer warns the employee about the infraction.") (emphasis added) with § 108.04(5g)(a)2. (Substantial fault does not include "[o]ne or more inadvertent errors made by the employee."). See also Operton, 369 Wis. 2d 166, ¶45 (Lundsten, J., concurring) ("This omission [of warnings], on the heels of express warning language in the rules infractions alternative, supports the conclusion that warnings are not relevant under the 'inadvertent errors' "alternative.").

¶66 The statutory language provides that substantial fault does not include "one or more inadvertent errors . . . ." Wis. Stat. § 108.04(5g)(a)2. According to this text, the "inadvertent errors" analysis contains no numerical limits.

¶67 I agree with Judge Lundsten's concurrence in the court of appeals: "[T]he statute tells us that, if all we have is repeated . . . 'inadvertent errors,' we do not have 'substantial fault.'"[5]

¶68 These missteps demonstrate that the majority opinion does not apply the rule that the unemployment compensation law is to be "liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status." Princess House, Inc. v. DILHR, 111 Wis. 2d 46, 62, 330 N.W.2d 169 (1983).

¶69 For the reasons set forth, I conclude that Lela Operton prevails, but I do not join the majority opinion.

¶70 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[5] Operton, 369 Wis. 2d 166, ¶43 (Lundsten, J., concurring).

¶71 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the court's opinion. I write separately to make a brief observation about agency deference. While the subject of agency deference may currently be a "hot button" issue, the law in Wisconsin on the subject is well-established: under proper circumstances this court will defer, to varying degrees, to an agency's interpretation of a statute. See, e.g., Wisconsin Dep't of Revenue v. Menasha Corp., 2008 WI 88, ¶¶47-50, 311 Wis. 2d 579, 754 N.W.2d 95. The parties in this case did not ask the court to address whether changes to that approach are warranted. There is little doubt that ending the court's practice of according deference to agency interpretations of statutes would constitute a sea change in Wisconsin law, and many interested parties would likely wish to weigh in. Consequently, I would want to see the issue set forth, briefed, and argued before expressing an opinion on the merits of such a change.

¶72 For the foregoing reasons, I respectfully concur.

¶73 REBECCA GRASSL BRADLEY, J. *(concurring).* Although I join the majority opinion, I write separately to question whether this court's practice of deferring to agency interpretations of statutes comports with the Wisconsin Constitution, which vests judicial power in this court——not administrative agencies. The Labor and Industry Review Commission (LIRC) asks this court to give "great weight" deference to its interpretation of the term "substantial fault" in Wis. Stat. § 108.04(5g)(a) (2013-14). Because "LIRC did not provide an articulated interpretation of § 108.04 in denying Operton unemployment benefits," the majority properly conducts an independent interpretation of § 108.04 without giving deference to LIRC. Majority op., ¶¶23-26. The doctrine of deference to agencies' statutory interpretation is a judicial creation that circumvents the court's duty to say what the law is and risks perpetuating erroneous declarations of the law. Because the court in this case fulfills its interpretive duty, I join the majority opinion but urge the court to reconsider its decades-long abdication of this core judicial function.

¶74 This court's current deference framework arises out of two cases from the mid-1990s. In Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 539 N.W.2d 98 (1995), the court identified "three distinct levels of deference to agency interpretations: great weight, due weight and de novo review." Id. at 659-60 (citing Jicha v. DILHR, 169 Wis. 2d 284, 290, 485 N.W.2d 256 (1992)). "Great weight" deference applies when four conditions are met:

(1) the agency was charged by the legislature with the duty of administering the statute; (2) [] the interpretation of the agency is one of long-standing; (3) [] the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) [] the agency's interpretation will provide uniformity and consistency in the application of the statute.

Id. at 660 (citing Lisney v. LIRC, 171 Wis. 2d 499, 505, 493 N.W.2d 14 (1992)). If an agency's interpretation of a statute qualifies for great weight deference, then the "interpretation must [] merely be reasonable for it to be sustained," and an interpretation is unreasonable only "if it directly contravenes the words of the statute, [] is clearly contrary to legislative intent or [] is without rational basis." Id. at 661-62.

¶75 In UFE Inc. v. LIRC, 201 Wis. 2d 274, 548 N.W.2d 57 (1996), this court elaborated on the "due weight" deference standard. "Under the due weight standard, 'a court need not defer to an agency's interpretation which, while reasonable, is not the interpretation which the court considers best and most reasonable.'" Id. at 286 (quoting Harnischfeger, 196 Wis. 2d at 660 n.4). Courts give due weight deference when an agency has "some experience" interpreting a statute but not so much as to "develop[] the expertise which necessarily places it in a better position" than a court "to make judgments regarding the interpretation." Id. An agency lacking special knowledge or expertise nevertheless might receive some deference if "the legislature has charged the agency with the enforcement of the statute in question." Id. A court giving due weight deference to an agency interpretation "will not overturn a reasonable agency decision that comports with the purpose of the statute

2

unless the court determines that there is a more reasonable interpretation available." Id. at 286-87.

¶76 Examination of the pre-Harnischfeger standard for reviewing agency interpretations of statutes suggests that the Harnischfeger court did not simply apply existing law——it recast it.[1] Before Harnischfeger, this court often articulated a slightly different standard of review: "[I]t is a well-established principle of statutory construction that the construction and interpretation of a statute adopted by an administrative agency charged with the duty of applying the law is entitled to great weight." Schwartz v. DILHR, 72 Wis. 2d 217, 221, 240 N.W.2d 173 (1976). Tracing that principle's development in Wisconsin law backwards from Harnischfeger leads to its source: Harrington v. Smith, 28 Wis. 43 (1871).[2]

¶77 Harrington presented this court with a dispute over the interpretation of a statute. Observing that "[t]he statute

---

[1] For a more complete evaluation of the court's characterization of existing law in Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 539 N.W.2d 98 (1995), see Patience Drake Roggensack, Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in This Court of Last Resort?, 89 Marq. L. Rev. 541, 548-61 (2006).

[2] See, e.g., Lisney v. LIRC, 171 Wis. 2d 499, 505-06, 493 N.W.2d 14 (1992); West Bend Educ. Ass'n v. WERC, 121 Wis. 2d 1, 12, 357 N.W.2d 534 (1984); Pigeon v. DILHR, 109 Wis. 2d 519, 524-25, 326 N.W.2d 752 (1982); Schwartz v. DILHR, 72 Wis. 2d 217, 221, 240 N.W.2d 173 (1976); City of Milwaukee v. WERC, 43 Wis. 2d 596, 599-601, 168 N.W.2d 809 (1969); Mednis v. Indus. Comm'n, 27 Wis. 2d 439, 444, 134 N.W.2d 416 (1965); Trczyniewski v. City of Milwaukee, 15 Wis. 2d 236, 240, 112 N.W.2d 725 (1961).

in question was enacted and has been continuously interpreted, understood and acted upon by the executive department of the government, the officers appointed by law to carry its provisions into effect, . . . for a period of over twenty-one years, and during twelve successive administrations of the state," the court concluded that "[g]reat weight is undoubtedly to be attached to a construction which has thus been given." Id. at 68-69. Accordingly, the Harrington court explained: "Long and uninterrupted practice under a statute, especially by the officers whose duty it was to execute it, is good evidence of its construction, and such practical construction will be adhered to, even though, were it res integra,[3] it might be difficult to maintain it." Harrington, 28 Wis. at 68. In support of that proposition, this court cited, among other authorities, Edwards' Lessee v. Darby, 25 U.S. (12 Wheat.) 206 (1827), which stated that, "[i]n the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect." Id. at 210.[4]

---

[3] Latin for "an entire thing," as a legal term res integra refers to an "undecided question of law" or a "case of first impression." Res Integra, Black's Law Dictionary 1503 (10th ed. 2014) (citing Res Nova, id. at 1504).

[4] In Chevron U.S.A. Inc. v. Natural Resources Defense Counsel, Inc., 467 U.S. 837 (1984), the Supreme Court also cited Edwards' Lessee v. Darby, 25 U.S. (12 Wheat.) 206 (1827), among many other cases, when constructing the two-step framework that has become the cornerstone of judicial review of agency determinations at the federal level. Chevron, 467 U.S. at 844
(continued)

4

¶78 By recognizing the value of executive interpretations without entirely ceding interpretive authority to the executive, these older cases reflect a more nuanced appreciation for judicial interaction with agency interpretation than this court's post-Harnischfeger deference standards permit. The prevailing scheme of deference hamstrings a court of last resort——with self-imposed shackles——from independently interpreting the law, thereby thwarting the constitutional structure of dispersing power among the three branches of government. Because this structure has long been recognized as the essential safeguard of individual rights and liberty,[5] this

---

n.14. Although I will not, in this writing, endeavor to conduct a comprehensive review comparing federal agency deference to Wisconsin law, it suffices for now to note that federal administrative deference under Chevron seems to raise separation of powers concerns under the United States Constitution similar to those I identify in Wisconsin. See, e.g., Michigan v. EPA, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring) (arguing that transferring "ultimate interpretive authority" to the Executive "is in tension with Article III's Vesting Clause, which vests the judicial power exclusively in Article III courts, not administrative agencies"); City of Arlington v. FCC, 133 S. Ct. 1863, 1879 (2013) (Roberts, C.J., dissenting) ("It would be a bit much to describe the result as 'the very definition of tyranny,' but the danger posed by the growing power of the administrative state cannot be dismissed."); see also Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1152 (10th Cir. 2016) (Gorsuch, J., concurring) ("Transferring the job of saying what the law is from the judiciary to the executive unsurprisingly invites the very sort of due process (fair notice) and equal protection concerns the framers knew would arise if the political branches intruded on judicial functions.").

[5] "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double

(continued)

5

court should reinforce that structure as a check against the concentration of power in the executive branch. "The doctrine of separation of powers, a fundamental principle of American constitutional government, is embodied in the clauses of the Wisconsin Constitution providing that the legislative power shall be vested in a senate and assembly, the executive power in a governor . . . , and the judicial power in the courts." State v. Washington, 83 Wis. 2d 808, 816, 266 N.W.2d 597 (1978) (citations omitted). No less than in the federal system, in Wisconsin "[i]t is emphatically the province and duty of the judicial department to say what the law is." State v. Williams, 2012 WI 59, ¶36 n.13, 341 Wis. 2d 191, 814 N.W.2d 460 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)); see also State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 436-37, 424 N.W.2d 385 (1988).

¶79 Acknowledging respect for a longstanding interpretation of a statute is a far cry from a judicial doctrine of "great weight" deference that relinquishes the court's responsibility to independently interpret statutes. Equally troubling is the possibility that seven elected justices——or, indeed, any elected judge accountable to the people of Wisconsin——might give "great weight" deference to an agency decision by a single, unelected administrative law judge or hearing examiner against whom the people have no recourse. Administrative rulemaking already shifts some lawmaking power to

security arises to the rights of the people." The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961).

unelected officials and away from the processes of passage and presentment contemplated by our constitution. Judicial deference to executive interpretations further widens the gap between the people and the laws that govern them.

¶80 The framers of our constitutions chose to disperse authority within the federal Republic and our state because they recognized that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961). As this court has recognized since Harrington, no harm comes to that separation when the judicial branch treats a well-developed executive interpretation of a statute as "some evidence of what the law is." Harrington, 28 Wis. at 69. But when the legislature delegates broad authority to an executive agency, which in turn interprets and enforces that delegated authority, the judiciary risks the liberty of all citizens if it abdicates its constitutional responsibility to check executive interpretations of the law. Because no such abdication occurs here, I join the majority opinion and respectfully concur.

¶81 I am authorized to state that Justices MICHAEL J. GABLEMAN and DANIEL KELLY join this concurrence.

7