Cindy L. KLATT, Plaintiff-Appellant,†

v.

LABOR AND INDUSTRY REVIEW COMMISSION and City of
Waukesha, Defendants-Respondents.

Court of Appeals

*No. 02–3218. Oral argument June 17, 2003.—Decided
August 13, 2003.*

2003 WI App 197

(Also reported in 669 N.W.2d 752.)

† Petition to review denied 10-21-03.

1040

On behalf of the plaintiff-appellant, there was oral argument and briefs submitted by *William R. Rettko* of *Rettko Law Offices, S.C.* of Brookfield.

On behalf of the defendant-respondent Labor and Industry Review Commission, there was oral argument and briefs submitted by *William W. Cassel.*

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. BROWN, J. This appeal is from an order of the circuit court affirming a decision of the Labor and Industry Review Commission (LIRC) of the Department of Industry, Labor and Human Relations denying unemployment compensation to Cindy L. Klatt, a former patrol officer with the City of Waukesha Police Department. On appeal, Klatt contends that LIRC incorrectly concluded that she voluntarily terminated her employment without good cause attributable to the City of Waukesha, her employer. We hold that Klatt's conduct of moving to Burlington in violation of the residency requirements of the collective bargaining

agreement between the City of Waukesha and the Waukesha police department was inconsistent with the continuation of the employer-employee relationship and she therefore voluntarily terminated her employment. We also conclude that Klatt failed to demonstrate that she had good cause to terminate her employment. We affirm.

¶ 2. The facts in this case are not in dispute. Klatt began her employment with the City of Waukesha Police Department in or around 1991. The 1991 collective bargaining agreement between the City of Waukesha and the Waukesha Professional Police Association contained the following language:

> 21.01 Employees will reside within twenty (20) minutes time of the Police Station subject to the approval of the Chief of Police. New employees must reside within twenty (20) minutes of the Station not later than three (3) months after completing their probationary period. This period may be extended for up to nine (9) additional months if a legal hardship would otherwise result.

In past agreements, the chief of police had the authority to grant an exemption to the residency requirement. In the most recent agreement, the City's common council had the authority to grant an exemption to the residency requirement.

¶ 3. On or about April 18, 2001, Klatt became engaged to a Racine County Sheriff's Department investigator. Klatt's fiancé had been employed by the Racine County Sheriff's Department for just under twelve years and his department also had a residency requirement requiring its members to live within Racine county. Due to the conflicting residency requirements of the collective bargaining agreement and the Racine County Sheriff's Department, Klatt and her

fiancé would not be able to comply with each agency's residency requirement and live together as a married couple in one household. Klatt's fiancé's request for an exemption from his employer's residency requirement was denied.

¶ 4. On April 18, Klatt notified her deputy chief that she was going to request an exemption from the residency requirement because she had become engaged to an investigator for the Racine County Sheriff's Department, which also had a residency requirement. The deputy chief indicated that he would speak with the city administrator about the matter. On April 20, the deputy chief informed Klatt that the City would not allow the exemption because it was a contractual matter and would set a precedent. Klatt went to her union representative and asked him to work on her behalf to get a marital hardship exemption because she had worked for the police department for ten years and did not want to lose her job.

¶ 5. Klatt then made an appointment to meet with the mayor of Waukesha at city hall to discuss getting an exemption from the residency requirement. When Klatt arrived at city hall, she was informed that she should speak with the city administrator instead of the mayor. The city administrator explained that he would introduce her request to the Human Resources Committee of the Common Council at their next meeting on June 13 and that Klatt should leave a short letter stating the reason she was requesting the exemption from the residency requirement. On May 31, Klatt submitted a request for an exemption from the residency requirement to the Human Resources Committee.

¶ 6. At the June 13 meeting of the Human Resources Committee, Klatt was given the opportunity to

explain her need for an exemption from the residency requirement. Klatt explained that her fiancé was a Racine County Sheriff's Department investigator whose department had a residency requirement mandating that he live in Racine county. Klatt also informed the committee that her fiancé asked the Racine county sheriff for an exemption and he refused to grant an exemption. In addition, Klatt informed the committee that her fiancé had two teenage children from a prior marriage who lived in the Burlington area, which is located in Racine county, and that they were trying to seek an exemption from the City of Waukesha because her fiancé had his children at least once a week and was involved with activities with his children. The committee denied Klatt's exemption request. The committee explained that the contract was specific and, although the committee sympathized with her situation, they were not going to allow for an exemption.

¶ 7. On August 17, Klatt moved out of Waukesha county to a residence in Burlington. On that same date, she provided her immediate supervisor with an interoffice memo informing him of her change of address. On August 27, her lieutenant asked her to submit an interoffice memo explaining her exact intentions. Klatt submitted the memo and in it clearly stated that she had no intention of quitting her position as an officer in the Waukesha police department. On August 28, Klatt received a letter informing her that she was in violation of the collective bargaining agreement and had thirty days to comply with the residency requirement.

¶ 8. On September 25 or 26, Klatt was notified that her union and the City of Waukesha had not reached an agreement and she needed to meet at city hall on September 28, at which time she was going to be terminated. On September 28, Klatt appeared at city

hall and handed her deputy chief and the city adminis-trator a letter requesting a one-year exemption from the residency requirement. At the same time, Klatt's deputy chief handed her a letter stating that her employment with the Waukesha police department was terminated effective 11:00 p.m. that same day.

¶ 9. In October, a deputy of the Department of Workforce Development issued an initial determination which found that in the week ending September 29, Klatt had terminated her employment within the meaning of WIS. STAT. § 108.04(7)(a) (2001–02).[1] The effect of this determination was to render Klatt ineli-gible for certain unemployment compensation benefits pursuant to the statute. Klatt appealed. After a hearing on the matter, an administrative law judge issued an appeal tribunal decision reversing the initial determi-nation and finding that Klatt had terminated her em-ployment with good cause attributable to the City, within the meaning of § 108.04(7)(b). The City filed a petition for review with LIRC. LIRC reversed the appeal tribunal decision and reinstated the initial determination's finding that Klatt had terminated her employment with the city, within the meaning of § 108.04(7)(a). The circuit court affirmed and Klatt now appeals.

¶ 10. We first turn to the scope of our review. We review LIRC's factual findings and legal conclusions, not those of the circuit court. *Michels Pipeline Constr., Inc. v. LIRC*, 197 Wis. 2d 927, 930, 541 N.W.2d 241 (Ct. App. 1995). Whether Klatt is entitled to unemployment benefits under WIS. STAT. ch. 108 is a mixed question of

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

law and fact. *See Michels*, 197 Wis. 2d at 931. Because the parties do not contest the material facts on appeal, our review is limited to LIRC's application of the unemployment benefits statutes to these facts, which presents a question of law. *See id.*

¶ 11. When reviewing LIRC's conclusions of law, we apply a sliding scale of deference that is contingent upon the level of LIRC's experience, technical competence and specialized knowledge. *Bretl v. LIRC,* 204 Wis. 2d 93, 104–05, 553 N.W.2d 550 (Ct. App. 1996). The greatest level of deference requires that we give great weight to LIRC's legal conclusions if: (1) the agency was charged by the legislature with the duty of administering the statute, (2) the interpretation of the agency is one of long-standing, (3) the agency employed its specialized knowledge or expertise in forming the interpretation, and (4) the agency's interpretation will provide consistency and uniformity in the application of the statute. *Tannler v. DHSS,* 211 Wis. 2d 179, 184, 564 N.W.2d 735 (1997). The next level of deference provides that if LIRC's decision is very nearly one of first impression, we must give due weight to that decision. *Bretl,* 204 Wis. 2d at 104–05. Finally, we owe no deference to LIRC and will conduct a de novo review if it is clear that the case is one of first impression and LIRC's special expertise and experience are no greater than ours. *Id.*

¶ 12. The parties dispute the level of deference we should give LIRC's conclusions of law. Klatt argues that de novo review is appropriate because there are no published decisions applying the statutory provisions of WIS. STAT. ch. 108 to an employee who terminates his or her employment by failing to comply with a municipal or county residency requirement. Alternatively, Klatt

1048

contends that the second level of review, the "due weight" standard, should be used as opposed to the "great weight" standard because LIRC's decision is, at least, "very nearly" one of first impression. LIRC responds that it has been charged with the duty of administering WIS. STAT. § 108.04(7)(a) and (b) and its interpretation of these statutes is long-standing and, therefore, its decision is entitled to great weight deference.

¶ 13. We are satisfied that LIRC meets the criteria for great weight deference in this case. Klatt is challenging LIRC's determinations that she had voluntarily terminated her employment within the meaning of WIS. STAT. § 108.04(7)(a) and that she had not demonstrated "good cause" for terminating her employment within the meaning of § 108.04(7)(b). As LIRC observes, it is charged with the duty of administering § 108.04(7)(a) and (b) and has gained significant experience in interpreting and applying those statutes in the discharge of its duty, including in situations dealing with municipal or county residency requirements.

¶ 14. We reject Klatt's argument that a de novo or due weight deference review of LIRC's ruling is appropriate based on the lack of published precedent interpreting WIS. STAT. ch. 108 in a situation where an employee has terminated his or her employment by failing to comply with a municipal or county residency requirement. First, the lack of published precedent does not indicate that this is an issue of first impression or very nearly an issue of first impression for LIRC. Second, it is not necessary that LIRC has previously ruled on the application of ch. 108 to a factual situation exactly similar to the one presented if LIRC otherwise

has extensive experience in administering the statutory scheme in a variety of situations. *See Town of Russell Volunteer Fire Dep't v. LIRC,* 223 Wis. 2d 723, 733, 589 N.W.2d 445 (Ct. App. 1998) ("The correct test under Wisconsin law is whether LIRC has experience in interpreting a particular statutory scheme, not whether it has ruled on precise, or even substantially similar, facts before."); *Honthaners Rests., Inc. v. LIRC,* 2000 WI App 273, ¶ 12, 240 Wis. 2d 234, 243, 621 N.W.2d 660 (noting that even where LIRC has not decided a case presenting the precise facts raised on appeal, the court may still accord LIRC great weight deference). Accordingly, because we conclude that LIRC's determination should be accorded great weight deference, we will uphold LIRC's decision so long as it was reasonable, even if we feel that an alternative interpretation is more reasonable. *See Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 661, 539 N.W.2d 98 (1995).

¶ 15. Bearing this deferential standard of review in mind, we now turn to the core issue on appeal: whether Klatt should be denied unemployment compensation benefits on the grounds that she voluntarily terminated her employment without good cause attributable to the City of Waukesha. The applicable law governing payment of unemployment compensation is WIS. STAT. § 108.04(7), which states the general rule that an employee who voluntarily terminates his or her employment with an employing unit is ineligible for benefits. One exception to this rule is that the employee may receive benefits if he or she voluntarily terminates his or her employment with good cause attributable to the employing unit. *Nottelson v. DILHR,* 94 Wis. 2d 106, 118, 287 N.W.2d 763 (1980). The meaning of the statutory terms "voluntary termination" and "good

cause attributable to the employing unit" have been developed in case law. In *Dentici v. Industrial Commission*, 264 Wis. 181, 186, 58 N.W.2d 717 (1953), our supreme court set forth the applicable test for determining whether a discharge constitutes a "voluntary termination":

> When an employee shows that he [or she] intends to leave his [or her] employment and indicates such intention by word or manner of action, or by conduct inconsistent with the continuation of the employee-employer relationship, it must be held . . . that the employee intended and did leave his [or her] employment voluntarily.

Our supreme court has interpreted "good cause attributable to the employing unit" as meaning some act or omission by the employer justifying the employee's quitting; it involves "some fault" on the part of the employer and must be "real and substantial." *Kessler v. Indus. Comm'n*, 27 Wis. 2d 398, 401, 134 N.W.2d 412 (1965).

¶ 16. LIRC concluded that the facts established that Klatt's termination was voluntary and the voluntary termination was not with good cause attributable to the City. Klatt challenges this determination on two grounds. First, Klatt contends that her conduct was not inconsistent with the continuation of the employer-employee relationship and therefore she did not voluntarily terminate her employment. Relying on *Holy Name School v. DILHR*, 109 Wis. 2d 381, 382, 326 N.W.2d 121 (Ct. App. 1982), Klatt maintains that LIRC incorrectly decided that she, by moving to Burlington while knowing that residing within twenty minutes of the police station was a condition of continuing employment, engaged in conduct which was inconsistent with the continuation of the employer-employee relation-

1051

ship. In the alternative, Klatt argues that her case comes under *Nottelson*, 94 Wis. 2d at 124–25, and contends that she raised a "meritorious justification," that being her constitutional right to marriage and family, for her decision to move in violation of the residency requirement and, as a result, her conduct cannot be considered inconsistent with the continuation of the employer-employee relationship. Second, Klatt contends that the City's conduct provided good cause for her decision to terminate her employment. We address these arguments in turn.

¶ 17. Klatt maintains that her circumstances are akin to those of the employee in *Holy Name* and argues that, like the employee in that case, her termination was not voluntary. In *Holy Name*, we addressed whether the claimant, Retlick, a Catholic schoolteacher, had voluntarily terminated her employment so as to bar her claim for unemployment compensation benefits when she married a divorced man before she had taken all the steps necessary to have the marriage blessed. *Holy Name*, 109 Wis. 2d at 387–88. During her employment, school personnel discovered that Retlick planned to marry a divorced man. *Id.* at 384. The school principal informed Retlick that in order to comply with the tenets of the Catholic church and to be considered a practicing Catholic, she and her fiancé had to take steps to have the church annul her fiancé's former marriage and to bless her marriage to her fiancé. *Id.* The principal also advised Retlick that her failure to comply with these requirements could result in a loss of employment because she would be in violation of her teaching contract, the "Declaration of Catholic Educational Philosophy," which required her to set an example for her students, and a written diocesan educational board policy for religion teachers containing requirements for

1052

practicing Catholics. *Id.* Although Retlick had initiated proceedings to have her fiancé's former marriage annulled and her marriage blessed, this process was not completed when she married. *Id.* at 384–85. Retlick's contract for the new school year was not renewed and Retlick applied for unemployment compensation. *Id.*

¶ 18. We held that Retlick did not voluntarily terminate her employment pursuant to Wis. Stat. § 108.04(7)(a). *Holy Name,* 109 Wis. 2d at 389. We concluded that sufficient evidence supported LIRC's determination that Retlick intended to preserve her employment relationship and that her conduct in marrying was not inconsistent with the continuation of the employment relationship. *Id.* at 388–89. We explained that even prior to her discussion with the principal concerning the ramifications of her impending marriage, Retlick had contacted a priest to initiate annulment proceedings. *Id.* at 388. We noted that when Retlick began the annulment and marriage validation procedure, she and her fiancé had not yet set a definite wedding date and that only a personal crisis involving her fiancé's two small children prompted their sudden decision to marry so that she could be a mother to the children. *Id.* Of great importance to this case was our observation that Retlick continued to take steps to have her marriage validated so that she would be in compliance with her employer's rules both after her contract was not renewed and after her marriage. *Id.*

¶ 19. Here, Klatt argues that her conduct is analogous to Retlick's ongoing effort to satisfy her employer's requirement that her fiancé's marriage be annulled. Klatt goes to great lengths to demonstrate how she took every reasonable step she could to maintain her employment and persuade the City to grant her

an exemption from the residency requirement and argues that because she did essentially everything she could to obtain such an exemption she, like Retlick, did not voluntarily terminate her employment. Klatt, however, misses a key distinction. In *Holy Name*, Retlick's efforts were directed at *complying* with the religious requirements in order to retain her employment and she was in the process of trying to comply with them at the time of her termination. By contrast, Klatt's efforts were all directed towards obtaining an *exemption* from the residency requirement. It would not be possible for Klatt to move to Burlington and satisfy the dictates of the collective bargaining agreement. As *Holy Name* teaches us, a determination of whether there has been a voluntary termination is dependent on an employee's conduct; it must be inconsistent with the continuation of the employment relationship. *See id.* at 388–89. After her requests for an exemption were all denied, Klatt chose to move to Burlington to reside with her new husband, and to stay there, knowing that this violated the residency requirement and that she would not be able to retain her employment. Her conduct was clearly contrary to her employer's interests and was not consistent with the continuation of the employment relationship. We, therefore, reject Klatt's attempt to analogize her situation to the one presented in *Holy Name*.

¶ 20. Klatt next relies on *Nottelson* and argues that like the employee in that case, she has a "meritorious justification" for her violation of the residency requirement and thus her conduct was not inconsistent with the continuation of the employer-employee relationship. There, Nottelson was discharged for failing to pay union dues. *Nottelson*, 94 Wis. 2d at 111. Nottelson objected to the requirement that he pay union dues based on religious grounds and prior to his termination

obtained a restraining order preventing the termination on the basis that his union might have discriminated against him due to his religion in violation of Title VII of the Civil Rights Act of 1964. *Nottelson*, 94 Wis. 2d at 111–12. We held that because Nottelson had a meritorious justification for his conduct—that is, whether his religious beliefs as protected by the Federal Civil Rights Act relieved him of his obligation to pay the union dues—his conduct was consistent with the continuation of the employee-employer relationship. *Id.* at 124–25.

¶ 21. Here, Klatt invokes her constitutional right to marriage and family and argues that it is akin to Nottelson's assertion of his right to freedom of religion. While Klatt acknowledges that it is well established that there is nothing objectionable, constitutionally or otherwise, about ordinances requiring public employees to maintain a specific municipal or county residence, Klatt maintains that under the circumstances of this case the otherwise enforceable residency requirement is unconstitutional and unenforceable. For support, Klatt cites *Cardenas v. Fire and Police Comm'n of City of Milwaukee*, 167 F. Supp. 2d 1055 (E.D. Wis. 2001), and argues that the court there held that the enforcement of a residency requirement violated the employee's constitutional right to family and marriage.

¶ 22. Klatt's reliance on *Nottelson* and *Cardenas* is misguided. First, Klatt misinterprets *Cardenas*. In that case, the court reversed a decision of the Fire and Police Commission of the City of Milwaukee denying an employee's request for a hardship exemption from the city's residency requirement. *Cardenas*, 167 F. Supp. 2d at 1066. There, the employee was faced with the decision either to send his children to a school for the deaf so they could obtain the special education they required

and live apart from them or move so he could live near his children and be terminated from his employment with the city. *Id.* at 1056–57. The court's decision to reverse the denial of the exemption was premised on the fact that the Fire and Police Commission had exceeded its jurisdiction in ruling on the request by failing to consider the statutorily enumerated factors for determining whether a hardship exemption was warranted. *Id.* at 1063–65. Nowhere did the court hold that the failure to grant the hardship exemption violated the employee's constitutional right to marriage and family.

¶ 23. Second, contrary to Klatt's assertions that she is not attacking the constitutionality of the residency requirement, we can come to no other conclusion but that she is doing just that, at least as applied to her. But the law is that state or local regulations are not unconstitutional deprivations of the right of family association unless they regulate the family directly. *Hameetman v. City of Chicago*, 776 F.2d 636, 643 (7th Cir. 1985) (refusing to invalidate a residency requirement merely because it might have the incidental and unintended effect of inducing family members to live apart). The collateral consequences of regulations not directed at the family do not bring the constitutional rights of family into play. *Id.* In the other cases Klatt cites, the statutes at issue were found unconstitutional because they directly interfered with the right to marry or the right to procreate. *See Zablocki v. Redhail*, 434 U.S. 374, 375, 386–87 (1978) (statute prohibited marriage for anyone owing back child support); *Loving v. Virginia*, 388 U.S. 1, 11–12 (1967) (anti-miscegenation statute); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 536, 538 (1942) (statute mandated steriliza-

tion for two-time sex offenders). Here, however, the residency requirement does not directly interfere with Klatt's right to marry. The requirement does not dictate whom Klatt may or may not marry. Klatt may marry whomever she chooses; she is only required to live within a certain designated area. The fact that Klatt may not live with an individual who has a conflicting residency requirement is an incidental and unintended consequence of a requirement contained in a negotiated collective bargaining agreement. Thus, Klatt's argument, that she, like Nottelson, had a "meritorious justification" for her actions, fails.

¶ 24. While we recognize that Klatt faced an unpleasant decision, it was her choice to make. She chose to move to Burlington to live with her husband and stay there with the knowledge that she would be in violation of the collective bargaining agreement and that this was contrary to her employer's interests and would mean the end of her employment. We conclude that Klatt's failure to adhere to the terms of the residency requirement amounted to conduct inconsistent with the continuation of her employment relationship. Accordingly, we uphold LIRC's determination that her actions constituted voluntary termination pursuant to Wis. Stat. § 108.04(7)(a).

¶ 25. Having concluded that Klatt voluntarily terminated her employment, the next question is whether that termination was with "good cause" pursuant to Wis. Stat. § 108.04(7)(b). We emphasize that to demonstrate good cause, Klatt must show that her termination involved some real and substantial fault on the part of the employer. In support of her argument that she had good cause, Klatt cites to the administrative law judge's opinion, which relied on Klatt's substantial

efforts to gain an exception to the residency requirement to justify its conclusion. However, LIRC reversed that opinion and it is the LIRC opinion that we review. While we sympathize with Klatt and are cognizant that she had a difficult choice to make, we fail to see how her termination was due to an act or omission on the part of the City that we can chalk up to "fault." Instead, the City was simply seeking to enforce a provision that the union had agreed to in the bargaining process. Klatt also attempts to raise a constitutional challenge to the residency requirement in the context of her good cause argument. As discussed above, this argument is without merit. We therefore conclude that Klatt failed to demonstrate good cause for terminating her employment. Accordingly, we affirm LIRC's decision.

*By the Court.*—Order affirmed.