## COURT OF APPEALS
## DECISION
## DATED AND FILED

## April 16, 2020

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2018AP2164**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018CV79

**IN COURT OF APPEALS**
**DISTRICT IV**

JASON WHITTLESEY,

    PLAINTIFF-APPELLANT,

  V.

LABOR AND INDUSTRY REVIEW COMMISSION AND LHM BREW PUB LLC,

    DEFENDANTS-RESPONDENTS,

DEPARTMENT OF WORKFORCE DEVELOPMENT,

    DEFENDANT-CO-APPELLANT.

       APPEAL from an order of the circuit court for Wood County: TODD P. WOLF, Judge. *Reversed and cause remanded with directions*.

       Before Fitzpatrick, P.J., Graham and Nashold, JJ.

       **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jason Whittlesey and the Department of Workforce Development appeal an order of the Wood County Circuit Court affirming the Labor and Industry Review Commission's determination that Whittlesey voluntarily terminated his employment without good cause attributable to the employer, within the meaning of WIS. STAT. § 108.04(7)(b) (2017-18),[1] and was therefore ineligible to receive unemployment insurance benefits.[2] We conclude that Whittlesey had good cause attributable to the employer to terminate his employment. Accordingly, we reverse the circuit court's order affirming the Commission's decision and remand this matter to the circuit court for remand to the Commission to reinstate Whittlesey's unemployment insurance benefits.[3]

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] Consistent with the submissions of the parties, we will refer to the Labor and Industry Review Commission as "the Commission," and we will refer to the Department of Workforce Development as "the Department."

Consistent with the decision of the Commission, we will use the terms "employer" or "restaurant" to refer to the respondent that formerly employed Whittlesey. The employer has not filed a brief in this court.

The Department filed a cross-appeal of the circuit court's order on the issue of whether Whittlesey was eligible for unemployment insurance benefits. As noted in this court's order of December 13, 2018, we consider this a co-appeal by Whittlesey and the Department on that issue.

[3] Because we conclude that Whittlesey was entitled to unemployment benefits under WIS. STAT. § 108.04(7)(b), we do not address arguments made by Whittlesey that, if he did not have good cause attributable to the employer for quitting, he should not be obligated to repay those unemployment benefits paid to him following the appeal tribunal's determination but before the Commission reversed that determination. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (if a decision on one point disposes of the appeal, this court need not decide other issues raised).

## BACKGROUND

¶2     The following material facts are taken from the Commission's decision, and the record, and are not disputed on appeal.[4]

¶3     Whittlesey worked as a senior line cook for his employer, a restaurant in central Wisconsin, for approximately two years. In briefing in this court, the Commission agrees that, "[b]y all accounts, [Whittlesey] was a good cook and a decent employee." Whittlesey is African American. The parties do not dispute that Whittlesey was the only African American employee working for the employer during the relevant time period. The Commission found that Whittlesey voluntarily terminated his employment with the employer because Whittlesey "believed the work environment was hostile and insensitive to his race."[5]

¶4     In November 2015, Whittlesey inadvertently dropped a plate of food on the floor in the employer's kitchen. In response, the prep cook exclaimed

---

[4] The Commission issued a decision on January 31, 2018, reversing the appeal tribunal's decision by an Administrative Law Judge (ALJ). In a decision dated February 28, 2018, the Commission set aside its January 31, 2018 decision and "reinstate[d] it with" the February 28, 2018 decision. The two versions of the decisions are substantially the same. The only material difference is the inclusion of an additional paragraph in the "Memorandum Opinion" portion of the February 28, 2018 decision that summarizes the May 2017 incident described below. The Department contends that we should review only the January 31, 2018 decision from the Commission. We need not decide the Department's argument because the result in this appeal would be the same regardless of which version of the Commission decision we review.

[5] Pertinent events in this case center around the use by employees of what the parties and this court agree is an offensive racial epithet. In order to have a clear record of those events for our analysis, the Background section of this opinion reproduces verbatim the words that the Commission found were actually uttered by employees, while recognizing that this language is offensive and racist. Elsewhere in the opinion, we refer to the offensive word used by employees, and variations on that word, as "the offensive racial epithet," "the offensive racist language" or words to that effect.

"[f]ucking nigger" in front of Whittlesey and other employees. Whittlesey informed a manager of the prep cook's comment. The manager spoke with the prep cook about the comment, and the prep cook apologized to Whittlesey.

¶5 The next month, in December 2015, Whittlesey had the radio on at work and another employee (not the prep cook mentioned in the immediately preceding paragraph) asked Whittlesey how much time Whittlesey had left on his shift. Whittlesey told the employee that he had about an hour left to work, to which the employee replied: "I can put up with these 'nig' beats for another hour." Whittlesey sent an email to a manager complaining about that employee's language, and Whittlesey asked the manager to speak with the employee and give that employee diversity training. Because Whittlesey felt that nothing was being done about his complaints, Whittlesey subsequently sent a letter to the owners of the employer in which he outlined his complaints about the November 2015 and December 2015 incidents mentioned above.

¶6 In May 2016, at his annual work review, Whittlesey met with several members of the employer's management team, including the owners of the employer. At that review, Whittlesey again reported that the offensive racial epithet was being used in the workplace. The owners asked Whittlesey if management should intercede. Whittlesey declined at that time, but Whittlesey expressed concern to the owners at that time that he was being "written up" (meaning disciplined in some fashion) for certain food handling conduct, but that other employees were not being written up for using that offensive racist word.

¶7 Two relevant incidents occurred in April 2017. In the first incident, Whittlesey and a co-worker, who was not one of the employees mentioned above in the two previous incidents, were texting each other about possible menu item

4

changes for the employer's restaurant. At one point in their text exchange, the co-worker wrote the following to Whittlesey: "We all be some dumb grubbing niggas next to you player." Whittlesey did not interpret that comment as friendly. Whittlesey did not complain to his employer about that text because, according to Whittlesey's testimony, "nothing had been done before in the past" by the employer about the use of that racist term by employees, and he did not report it "[e]specially after the owner asked me if I knew where to buy chitlins." We will now describe that incident.

¶8 Also during April 2017, one of the owners of the employer asked Whittlesey if Whittlesey knew where to buy what the owner referred to as "chitterlings."[6] Whittlesey let the owner know that he found the question offensive. Whittlesey testified that he found the question offensive because asking "only black people … if they know where to buy chitlins from.… it's stereotypical."

¶9 Less than one month after that incident, on May 5, 2017, the owners of the employer met with the entire restaurant staff and discussed what the owners referred to as "core values and goals" for the business. The owners did not specifically discuss, or instruct the employees to stop, using any form of the offensive racial epithet in the work place. As a result of that meeting, the owners required each employee to sign a document which stated, among other things, that employees must "respect cultural/language differences" and not create a "hostile or threatening work environment."

---

[6] Whittlesey referred to this in his testimony as "chitlins." The parties do not dispute that both terms refer to pig intestines.

¶10 Eleven days after that meeting, on May 16, 2017, an employee (who was not one of the employees mentioned above in the previous incidents) found a comb at the restaurant and asked another employee if "that was your nigger comb." Whittlesey was not working that day, but several employees reported the comment to Whittlesey the next day. One of the owners learned of the comment and asked Whittlesey which employee made that comment. Whittlesey replied that it was the owner's job, and not his, to identify the employee who made the comment. The owner advised the employee who made the comb comment not to use that offensive word again at the employer's place of business.

¶11 In July 2017, an employee with what the Commission referred to in its written decision as a "cognitive disability" was cleaning a shelf and, when she finished, she told Whittlesey that the shelf "shines like a nigger's heel." Whittlesey was upset by the remark. One of the owners spoke with that employee and told her that the phrase was inappropriate and that she should apologize to Whittlesey. The owner asked Whittlesey if he wished to "educate" the co-worker. Whittlesey became upset by that request by the owner and was sent home for the remainder of his assigned shift.

¶12 Shortly after that July 2017 incident, Whittlesey voluntarily terminated his employment in a letter in which he described the employer's place of business as a "hostile work environment." The letter also stated that Whittlesey no longer wished to "be subject to double standards and bigotry." And, "[t]he fact that the[] 'N' word, if disciplined at all, is treated with a slap on the wrist" was a reason for his quitting, according to Whittlesey's letter.

¶13 Whittlesey filed a claim for unemployment benefits with the Department. The Department issued an initial determination denying Whittlesey's

claim on the grounds that Whittlesey voluntarily terminated his employment without good cause attributable to the employer.

¶14 Whittlesey appealed the Department's initial determination to an appeal tribunal. An evidentiary hearing was held before an ALJ regarding that appeal. The ALJ issued a written decision reversing the Department's initial determination. The ALJ concluded that Whittlesey was eligible for unemployment benefits because Whittlesey quit for good cause attributable to the employer within the meaning of WIS. STAT. § 108.04(7)(b). The ALJ determined in relevant part:

> Here, the employee perceived that he was being punished for the way he was handling food, but the co-workers who were making racially insensitive remarks to him were not being punished. Although the employer talked to individuals after incidents occurred, they never told the entire staff to simply stop using the word around the restaurant. Within two months of the employer's meeting where core values were discussed with the entire staff, two more incidents occurred…. The circumstances presented demonstrate that the employee's decision to quit was reasonable based upon his perception that the racial insensitivity at the restaurant would not end.

¶15 The employer petitioned the Commission for review of the ALJ's decision, and the Commission reversed the ALJ's decision. The Commission concluded that Whittlesey did not establish that he quit his employment with good cause attributable to the employer. Whittlesey was ordered by the Commission to repay unemployment benefits he had received in the amount of $9,250.

¶16 Whittlesey sought review of the Commission's decision in the circuit court. The Department, which was named as a defendant in the action in the circuit court, also sought reversal of the Commission's decision. The circuit court affirmed the Commission's decision, and Whittlesey and the Department appeal.

¶17    We will mention other material facts in the following Discussion.

## DISCUSSION

¶18    Whittlesey[7] argues that the Commission erred in determining that he is ineligible for unemployment benefits because he voluntarily terminated his employment without good cause attributable to the employer.  Below we set forth our standard of review and the governing legal principles.  We then address the Commission's conclusions and the parties' arguments.

## I.  Standard of Review and Governing Legal Principles.

¶19    We review the decision of the Commission, not that of the circuit court.  *Operton v. LIRC*, 2017 WI 46, ¶18, 375 Wis. 2d 1, 894 N.W.2d 426; *Klatt v. LIRC*, 2003 WI App 197, ¶10, 266 Wis. 2d 1038, 669 N.W.2d 752.

¶20    Whether a former employee is entitled to unemployment benefits under WIS. STAT. ch. 108 presents a mixed question of fact and law.  *Klatt*, 266 Wis. 2d 1038, ¶10.  We will uphold the Commission's factual findings if those are supported by credible and substantial evidence.  *Operton*, 375 Wis. 2d 1, ¶18.  The parties do not contest the material facts on appeal, so our review concerns the Commission's application of a statute to these facts.  That determination of whether Whittlesey's voluntary termination of employment was due to good cause attributable to the employer under WIS. STAT. § 108.04(7)(b) is a question of law, and we review that question without deference to the Commission's decision.  *See*

---

[7] For convenience, we will now refer to Whittlesey and the Department collectively as "Whittlesey" when discussing arguments made by those parties.  When referring to pertinent events, our reference to "Whittlesey" is, of course, to appellant Jason Whittlesey.

***Kierstead v. LIRC***, 2012 WI App 57, ¶12, 341 Wis. 2d 343, 817 N.W.2d 878; ***Klatt***, 266 Wis. 2d 1038, ¶¶10, 13; *see also* WIS. STAT. § 108.09(7)(c)6.c. (stating that, on judicial review, a court may "set aside" the order of the Commission if "the findings of fact by the [C]ommission do not support the order.").[8]

¶21     The arguments of the parties require us to interpret statutes.  This court is not bound by the Commission's interpretation of a statute.  *See **Operton***, 375 Wis. 2d 1, ¶19.  "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." ***State ex rel. Kalal v. Circuit Ct. for Dane Cty.***, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110.  "We assume that the legislature's intent is expressed in the statutory language." ***Id.***  For this reason, "statutory interpretation 'begins with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry.'" ***Id.***, ¶45 (quoting ***Seider v. O'Connell***, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659).  "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." ***Id.***  Further, "the court is not at liberty to disregard the plain, clear words of the statute." ***Id.***, ¶46 (quoting ***State v. Pratt***, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967)).

_____

[8] Relying on ***Tetra Tech EC, Inc. v. DOR***, 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21 and ***DWD v. LIRC***, 2018 WI 77, ¶4 n.4, 382 Wis. 2d 611, 914 N.W.2d 625, the Commission argues that, although we do not accord its legal conclusions deference, we must, as a matter of persuasion, give "due weight" to the Commission's "experience, technical competence, and specialized knowledge" when considering the Commission's arguments.  Whittlesey argues that due weight should not be given to the Commission's arguments because the due weight requirement is established by WIS. STAT. § 227.57(10), and unemployment insurance claim appeals are not controlled by WIS. STAT. ch. 227.  Instead, such appeals are controlled by WIS. STAT. ch. 108, which does not include a "due weight" requirement.  *See* WIS. STAT. § 108.09(7) (regarding judicial review of Commission's decisions).  We need not, and do not, resolve this issue because we conclude that, regardless of whether we accord the Commission's arguments due weight, the result in this appeal would be the same.

¶22  Our supreme court instructs that we interpret the applicable unemployment benefits statutes through the lens of the public policy underlying WIS. STAT. ch. 108:

> Wisconsin's unemployment compensation statutes embody a strong public policy in favor of compensating the unemployed.  This policy is codified in WIS. STAT. § 108.01 ….
>
> Consistent with this policy, WIS. STAT. ch. 108 is "liberally construed to effect unemployment compensation coverage for workers who are economically dependent upon others in respect to their wage-earning status."

*Operton*, 375 Wis. 2d 1, ¶¶31-32 (quoting *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 62, 330 N.W.2d 169 (1983)).

¶23  At issue in this case is whether Whittlesey, who undisputedly voluntarily terminated his employment, is nevertheless entitled to unemployment benefits.  The general rule is that an employee who voluntarily terminates his or her employment is ineligible for unemployment benefits.  *See* WIS. STAT. § 108.04(7)(a); *Kierstead*, 341 Wis. 2d 343, ¶8.  An exception to this general rule is that an employee will receive benefits if he or she voluntarily terminates his or her employment with "good cause attributable to the employing unit."  *See* § 108.04(7)(b); *Kierstead*, 341 Wis. 2d 343, ¶8.  "[G]ood cause attributable to the employing unit" has been interpreted by case law as "meaning some act or omission by the employer justifying the employee's quitting; it involves 'some fault' on the part of the employer and must be 'real and substantial.'"  *Klatt*, 266 Wis. 2d 1038, ¶15 (quoting *Kessler v. Industrial Comm'n*, 27 Wis. 2d 398, 401, 134 N.W.2d 412 (1965)).

¶24  In its written decision, the Commission placed the burden on Whittlesey to "establish that his quitting was with good cause attributable to the

employer." The Commission cited no authorities to support that conclusion of law. To sustain that contention in its briefing in this court, the Commission relies only on an opinion construing the burden of proof in a Wisconsin Fair Employment Act case under WIS. STAT. §§ 111.31-111.395. *See Chicago & N.W. R.R. v. LIRC*, 91 Wis. 2d 462, 467, 283 N.W.2d 603 (Ct. App. 1979) (in which, notably, this court placed the burden of proof on the employer, not the employee). For their part, neither Whittlesey nor the Department dispute the Commission's contention that the burden of proof was on Whittlesey to establish good cause.

¶25    Nonetheless, we question whether Whittlesey has the burden to establish that his voluntary termination was due to good cause attributable to the employer. The supreme court has held in this context: "[Placing the burden on the employer] is consistent with our past cases interpreting the unemployment benefits statutes in which we have held that 'the party (the employer here) resisting payment of benefits has the burden of proving that the case comes within the disqualifying provision of the law....'" *Operton*, 375 Wis. 2d 1, ¶38 (quoting *Brauneis v. LIRC*, 2000 WI 69, ¶22, 236 Wis. 2d 27, 612 N.W.2d 635). In *Brauneis*, our supreme court held that an employee who has lost his or her job due to a strike or other bona fide labor dispute – other than a lockout – is not eligible to receive unemployment compensation benefits. *Brauneis*, 236 Wis. 2d 27, ¶¶22-23; *see* WIS. STAT. § 108.04(10)(d). However, the burden is not on the employee to prove the exception that there is a lockout so as to make the employee eligible for unemployment compensation benefits. Instead, that burden is placed on the employer to disprove that the event is a lockout. *See Brauneis*, 236 Wis. 2d 27, ¶¶22-23 ("A benefit claimant is presumed eligible for [unemployment compensation] benefits and the party (the employer here) resisting payment of benefits has the burden of proving that the case comes within the disqualifying

11

provision of the law ….” (quoted source omitted)). Following that logic, because the employer in this case is resisting payments, the employer would have the burden of proving the disqualifying provision that Whittlesey's termination was not based on good cause attributable to the employing unit. *See* § 108.04(7)(b).

¶26    While we are mindful of that case law, because Whittlesey does not dispute that he has the burden here, we assume, without deciding, that the burden of proof is on Whittlesey to establish that his voluntary termination was based on good cause attributable to the employer.

## II. Whittlesey Terminated His Employment For Good Cause Attributable to the Employer.

¶27    The parties dispute the Commission's conclusions of law based on the undisputed facts. The Commission relied on the following four conclusions in support of its written decision that Whittlesey's termination of his employment was not based on good cause attributable to the employer:  (1) the question from an owner of the employer to Whittlesey about “chitterlings” was “not inherently objectionable”; (2) none of the conduct Whittlesey complained of was “either attributed to or countenanced by” the employer; (3) the employer's mandatory meeting for its employees sufficiently instructed the employees about acceptable professional behavior and conduct in the workplace; and (4) the employer “addressed” the objectionable statements of individual employees. Based upon our independent review of the undisputed facts, we reject the conclusions of the Commission and determine that Whittlesey has established that his voluntary termination was based on good cause attributable to the employer.

## A. Preliminary Matters.

¶28    We begin by addressing two preliminary matters pertinent to our analysis.

## 1. Reasonable Alternatives Short of Quitting.

¶29    The Commission contends in briefing in this court that, to prevail, Whittlesey must demonstrate that he pursued reasonable alternatives short of quitting to resolve his employment issues. We reject the Commission's contention for several reasons.

¶30    Although the Commission makes this argument on appeal, the Commission's written decision that we review makes no reference to this proposition. Put another way, the Commission demands on appeal that this court apply a requirement to Whittlesey's case that the Commission itself did not apply in its written decision. As mentioned, we review the decision of the Commission. *Operton*, 375 Wis. 2d 1, ¶18; *Klatt*, 266 Wis. 2d 1038, ¶10.

¶31    In addition, the authorities cited by the Commission in this court on this issue do not support the Commission's argument. The one Wisconsin appellate opinion the Commission relies on is *Mervosh v. LIRC*, 2010 WI App 36, ¶23, 324 Wis. 2d 134, 781 N.W.2d 236. According to the Commission, the *Mervosh* opinion holds "that in order to establish good cause, an employee must demonstrate that he or she pursued reasonable alternatives to resolve an employment issue short of quitting." *Mervosh* concerns an unemployment benefits dispute, but that opinion does not contain the holding attributed to it by the Commission.

¶32    The other authorities relied on by the Commission on appeal regarding this issue are four decisions of the Commission that are at least twenty years old (and those decisions cite to only a 1992 Commission manual which mentions this question).  *Lichtfuss v. Bemis Specialty Films*, UI Dec. Hearing No. 98402102AP (LIRC July 30, 1999); *Bunnell v. National Bldg. Maint.*, UI Dec. Hearing No. 98401333AP (LIRC Sept. 30, 1998); *Lauer v. Kentucky Fried Chicken*, UI Dec. Hearing No. 97201127EC (LIRC Nov. 28, 1997); *Gilkay v. Servicemaster of Stevens Point*, UI Dec. Hearing No. 95002242WR (LIRC Sept. 28, 1995).  We are not bound by any conclusions of law of the Commission or its interpretation of statutes.  *See Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21; *Operton*, 375 Wis. 2d 1, ¶19.  As a result, we need not accept the Commission's argument on this issue, and we review this issue independent of any conclusion of law in the Commission's previous decisions.[9]

¶33    We reject the Commission's contention on appeal, and in its previous decisions, that WIS. STAT. § 108.04(7)(b) requires an employee to demonstrate that he or she pursued reasonable alternatives to resolve an employment issue short of quitting.  The plain language of that statutory subpart does not contain that requirement, and we cannot reasonably infer that requirement from the language of the statute.  *See Kalal*, 271 Wis. 2d 633, ¶45.  In a particular

---

[9] Moreover, the argument as framed by the Commission overstates the Commission decisions on which it relies.  As an example, the Commission stated:  "While an employe is not required to exhaust all alternatives to quitting, *in most cases [he or] she is expected to at least pursue some resolution* to an employment issue prior to terminating [his or] her employment."  *Lauer v. Kentucky Fried Chicken*, UI Dec. Hearing No. 97201127EC, p.3 (LIRC Nov. 28, 1997) (emphasis added).  The current argument from the Commission places a more stringent burden on a claimant, such as Whittlesey, than the Commission's previous decisions.

factual situation, this *may* be a factor to consider. But, there is no statutory requirement that, to establish good cause, Whittlesey must demonstrate that he pursued reasonable alternatives to resolve employment issues short of quitting in order to obtain unemployment benefits. *See **Dawson v. Town of Jackson***, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316 ("We decline to read into the statute words the legislature did not see fit to write.").[10]

¶34 We next turn to the substance of the Commission's argument on appeal regarding Whittlesey's "reasonable alternatives" to quitting. Even if we assume the Commission is correct that this must be established by Whittlesey, the Commission's arguments fail.

¶35 The Commission contends, first, and in regard to the comb incident, that Whittlesey gave "less than full cooperation" to the employer because the employer found out the name of the employee who made the statement from someone other than Whittlesey. However, the Commission does not explain *why*

---

[10] The Commission also asserts that this requirement can be read in to WIS. STAT. § 108.04(7)(b) in light of the following language:

> In this paragraph, "good cause" includes, but is not limited to, a request, suggestion or directive by the employing unit that the employee violate federal or Wisconsin law, or sexual harassment, as defined in [WIS. STAT. §] 111.32(13), by an employing unit or employing unit's agent or a co-worker, of which the employer knew or should have known but failed to take timely and appropriate corrective action.

Sec. 108.04(7)(b). We reject that argument because, if the legislature intended that language to apply to all cases regarding good cause, it would have expressly said so rather than restricting that provision to violations of state and federal law and sexual harassment cases. We reject this argument for the further reason that the above-quoted language does not support the Commission's contention. Put another way, the statutory language focuses on what "the employer knew or should have known but failed" to take action. That verbiage focuses on the employer's knowledge and actions rather than alternative actions the employee might have taken.

that fact makes any difference to the question of whether Whittlesey explored reasonable alternatives to quitting. In other words, there is no discernable reason to conclude that, because the employer found out the name of the person who made the comment from someone other than Whittlesey, Whittlesey did not explore reasonable alternatives to quitting.

¶36 The Commission contends, second, that because Whittlesey did not tell the employer about the text message containing the offensive racial epithet, this court should conclude that Whittlesey failed to explore reasonable alternatives to quitting. Again, the Commission fails to connect in any discernable way its purported conclusion about reasonable alternatives to the lack of a report of the incident.

¶37 The Commission also contends that this court should not consider the text message incident in our analysis of the larger question of whether there was good cause attributable to the employer for Whittlesey quitting. The Commission gives no basis for its argument that the incident must be ignored. Indeed, the Commission's own written decision considered that incident in its analysis. We will not sanction the Commission's counsel's attempt on appeal to rewrite the Commission's decision, especially when there is no authority which requires us, or the Commission, to ignore this incident.[11]

---

[11] Also, and as noted, there is no dispute that Whittlesey testified that he did not report this incident because he believed nothing had been done by the employer previously when a racist comment was made at the restaurant. Under those circumstances in which Whittlesey believed reporting the incident would be futile, the failure to report this incident to the employer cannot support the contention that Whittlesey failed to explore reasonable alternatives to quitting.

¶38    For those reasons, we reject the Commission's attempt to require Whittlesey to prove that he explored reasonable alternatives to quitting.

## 2.  Attempts to Rewrite the Commission's Factual Findings.

¶39    Also as a preliminary matter, we note the attempt of the Commission in its appellate briefing to amend the factual findings of the Commission.  The Commission's brief in this court cites to disputed factual contentions which go well beyond the Commission's findings of fact found in its written decision.  We need not detail each example but, for context, we mention two examples:

- The Commission contends on appeal that the text message to Whittlesey should not have been considered offensive by Whittlesey because the phrase "was a self-deprecating comment about the author of the text."

- The Commission contends on appeal that the cognitively disabled employee "probably picked up this [offending] phrase from a book."

¶40    We will uphold the Commission's factual findings that are supported by credible and substantial evidence.  *Operton*, 375 Wis. 2d 1, ¶18.  We reject the Commission's counsel's attempts to rewrite the Commission's findings of fact. There is nothing in the Commission's written decision showing that it relied on those disputed "facts" as stated in the Commission's appellate brief when the Commission issued its decision.  As a result, we do not rely on alleged factual findings of the Commission which were not in the Commission's written decision.

¶41    We now discuss the conclusions of the Commission.

## B. The Owner's Question to Whittlesey About "Chitterlings."

¶42    The Commission recognized in its findings of fact the incident in which an owner of the employer asked Whittlesey where the owner could buy "chitterlings."  However, in its written decision, the Commission attempted to minimize that incident by concluding that it was "not inherently objectionable." The Commission did not explain in its written decision the basis for that conclusion.  Based on our independent review, we reject that conclusion of the Commission.   The comment by the owner supports the conclusion that Whittlesey's voluntary termination was based on good cause attributable to the employer.[12]

¶43    To grasp why we conclude that Whittlesey was correct in viewing the owner's comment as an offensive stereotype, we consider academic research on the topic to give context to the remark.  References to chitterlings are often entwined with racial stereotypes and allusions to slavery.  A study of media stereotypes states:

> Early analyses found media deeply implicated in the patterns of discrimination operating against black people…. In addition to overemphasizing and ridiculing their facial features, such portrayals also feature them eating certain foods such as watermelon, fried chicken and chitterlings (Counihan & Van Esterik, 1997).

---

[12] The Commission, in briefing in this court, contends that its conclusion that the chitterlings comment was "not inherently objectionable" is a finding of fact.  We are not persuaded by that contention.  The Commission's conclusion about the inherent objectionability of that comment is not within the designated findings of fact of the Commission.  More importantly, the Commission makes a generalized statement about how the chitterlings question would be perceived without mentioning any intent of the owner or perception of Whittlesey.  Such generalized statements are conclusions of law, to which we owe no deference, rather than findings of fact.

Mia Moody, *From Jezebel to Ho: An Analysis of Creative and Imaginative Shared Representations of African-American Women*, 4 J. RES. ON WOMEN AND GENDER (Mar. 2012), https://gato-docs.its.txstate.edu/jcr:2024e587-ea93-4a86-ad13-3ed7ca4e67ba/JRWG%2012-8%20Formatted%20Submission (last visited Apr. 10, 2020). Another study found:

> Also common were images of African Americans eating and drinking certain beverages and cuisine. For example, media often featured Blacks drinking red soda or Kool-Aid and eating watermelon, fried chicken, cornbread, pig's feet and chitterlings (Counihan & Van Esterik, 1997). During the slave era, these foods were considered undesirable because slaves enjoyed them and/or because they were slave-owners' "leftovers."

Mia Moody, *New Media-Same Stereotypes: An Analysis of Social Media Depictions of President Barack Obama and Michelle Obama*, 8 J. NEW MEDIA & CULTURE (Summer 2012), http://www.ibiblio.org/nmediac/summer2012/Articles/obama_facebook (last visited Apr. 10, 2020).

¶44   To be clear, we do not conclude that any reference to "chitterlings" is always offensive. Also, here, the question by an owner to Whittlesey about chitterlings is not as offensive as the use of various forms of the offensive racial epithet by employees of the restaurant. Nonetheless, Whittlesey was the only African American working at the restaurant. By the time the remark was made, the owners and management were informed of at least two incidents in which offensive racist remarks were made to Whittlesey at the place of employment. Under these circumstances, any reasonable person in Whittlesey's position would see the question about chitterlings from the owner as offensive and stereotypical.

¶45    Accordingly, we reject the conclusion of the Commission that the chitterlings comment was "not inherently objectionable." Indeed, while more subtle and different than the use of the offensive racial epithet by the employees, that conduct of the owner must be considered attributable to the employer and supports Whittlesey's position that his voluntary termination was with good cause attributable to the employer.

## C. "Attributed to or Countenanced by" the Employer.

¶46    The Commission also concluded that the offensive racist remarks by the employees were neither "attributed to [nor] countenanced by the owners or management."

¶47    We have already discussed that the "chitterlings" question by one of the owners was a reference to a stereotype, and Whittlesey reasonably took offense at that question. That offensive conduct was, in fact, "attributed to" an owner. Therefore, we reject that conclusion of the Commission.

¶48    As to whether management or the owners "countenanced" the remarks by employees, it is correct that there is no evidence that any manager or owner overtly encouraged any employee to use an offensive racist term at the place of employment. However, that observation of the Commission misses the mark regarding the statutory standard used to determine if Whittlesey is eligible for unemployment benefits. Whittlesey's claim for benefits does not fail because the employer did not actively encourage the offensive conduct. Instead, the question is whether there was some fault attributable to the employer, by action or omission, which constituted good cause for Whittlesey to voluntarily terminate. *See Kierstead*, 341 Wis. 2d 343, ¶8. Therefore, we now consider other actions or

omissions of the employer which may constitute good cause for Whittlesey to voluntarily terminate his employment.

### D. Mandatory Employee Meeting.

¶49     The Commission argues on appeal that the employer took "steps appropriate to correct the offender's behavior" in response to the racist comments made at the restaurant during Whittlesey's employment.   The Commission concluded in its written decision that the mandatory employee meeting discussed in this section of this opinion, and the actions of the employer discussed in the next section of this opinion, were sufficient responses to the racist comments of the employees such that Whittlesey did not establish that his voluntary termination was based on good cause attributable to the employer.   Based on our independent review, we reject the Commission's conclusions.

¶50     There is no dispute that Whittlesey was subjected to racist comments at the restaurant over the course of his employment.   Indeed, in a notable concession, the Commission agrees that "the ugly and objectionable nature of the [offensive racial epithet] and its incompatibility with the workplace" were "severe enough to warrant [Whittlesey] quitting."[13]  We now consider previous decisions of the Commission regarding the use of offensive racist language in the workplace and harassment in the workplace.   We are not bound by those decisions, but those inform our analysis.   Those decisions put into perspective the offensive nature of the racial epithets and the requirement that the employer take effective measures to stop those statements in the workplace.

---

[13] As well, the circuit court, in its decision, concluded:  "The court would look at as to whether that would be considered a hostile-type working environment.  It does."

¶51 The Commission has previously determined that use of the offensive racial epithet is misconduct so as to be grounds for dismissal, and no warning needs to be given to an employee not to use that term:

> The word "nigger" is a key term in American culture. It represents overt racial hatred and is a disparaging and offensive slur….
>
> The conduct for which the employee was discharged was sufficiently egregious that it is not necessary that it have been proved that the employee was expressly warned against it. The employee could be expected to know that his conduct was inappropriate, and no notice was thus needed. *See, e.g.*, ***Greenwald v. CUNA Mutual Insurance Society***, UI Dec. Hearing No. 02004775MD (LIRC Dec. 23, 2002) (employee in professional office setting needs no warning to know that the use of obscene language and gestures in reference to other employees is inappropriate). It is difficult to conceive of any kind of employment situation in which an employee would need to be told in advance that it is inappropriate for him to refer to his African-American co-workers as "niggers." *See, e.g.*, ***Xiong v. Educators Credit Union***, UI Dec. Hearing No. 07602326MW (LIRC Oct. 18, 2007) (employee's use of the term "ghetto" when referring to her co-workers was derogatory and constituted misconduct); ***Wright v. Wal Mart Associates Inc.***, UI Dec. Hearing No. 02611006MW (LIRC Aug. 13, 2003) (although it was an isolated incident, the employee's use of a racial epithet several times in referring to a co-worker as "a lazy black nigger" constituted misconduct); ***Boos v. Huntsinger Farms Inc.***, UI Dec. Hearing No. 02200180EC (LIRC May 24, 2002) (employee discharged for misconduct for calling one of the employer's customers a "nigger").

***Dassow v. Foremost Indus. Exch.***, UI Dec. Hearing No. 12600149MW (LIRC June 14, 2012).

¶52 Also pertinent to our discussion, the Commission has previously determined that harassment at work may provide good cause attributable to the employer for an employee to quit. *See* ***Knoll v. S & P Midwest Carriers Inc.***, UI Dec. Hearing No. 12604860MW (LIRC Nov. 30, 2012), p.2 (citing ***Clark v. I K I***

22

*Mfg. Co. Inc.*, UI Dec. Hearing No. 10003680JV (LIRC Oct. 29, 2010)). In *Knoll*, the Commission stated:

> [The employee] had good cause attributable to the employer to quit when the employer failed to act to improve her working situation. *See also* ***Bell v. Gardner Barn Equipment Co.***, UI Dec. Hearing No. 07400152AP (LIRC May 24, 2007) (no employee should have to tolerate constant yelling, swearing and belittling remarks); ***Cooper v. Landscape Nursery***, UI Dec. Hearing No. 02609727RC (LIRC May 2, 2003) (if employee notifies employer of unprofessional, rude, coarse and offensive behavior at the workplace, and the employer fails to take reasonable and necessary steps to address these concerns, good cause attributable to the employer will be found).

*Id.*

¶53 With that background, we now discuss the May 2017 mandatory employee meeting. At that meeting, the owners did not specifically discuss, or instruct the employees to stop, using any form of the offensive racial epithet in the workplace.

¶54 The employer handed out a sheet at the meeting.[14] The sheet is entitled "Professional Behavior and Conduct." It contains approximately fifty closely spaced lines of text and room at the bottom for the signature of the employee. It lists the goals of the business as:

> 1. Provide a hospitable environment with excellent food and beverages for patrons.
> 2. Provide meaningful employment for individuals in our community.

---

[14] *See **State v. Pepin***, 110 Wis. 2d 431, 439, 328 N.W.2d 898 (Ct. App. 1982) (stating that, when the question concerns what a document contains, an appellate court is in as good a position as the circuit court to make that determination). So, we need not defer to the Commission's findings regarding that document.

23

3. Accomplish number one and two in a manner that is sustainable (profitable).

¶55 On the sheet, the employer listed "Examples of Professional Behavior/Conduct." It states that it supports "teamwork, collaboration, and professional growth among employees." The sheet then states that employees should "[r]espect cultural/language differences" and "[s]peak to everyone in a respectful manner whether in person, on the telephone, or by e-mail." Non-professional behavior is described, in part, as behavior that creates "a hostile or threatening work environment." Of importance, at the bottom of the sheet, it is stated that, if "individual behaviors [] are not consistent with our core values," those "may be dealt with by verbal warnings and counseling, specific written warnings, *and if persistent, termination of employment*." (Emphasis added.)

¶56 From the statements on that sheet from the employer, it would reasonably be concluded by an employee that behavior not consistent with the "core values" of the business will not be subject to termination of employment unless that behavior is "persistent." At the meeting the employer did not specifically mention the offensive racial epithet that Whittlesey had been subjected to. If employees understood the employer to be saying that use of that word at the workplace is "inconsistent with the core values of the business," then employees would also conclude that use of that word will cause termination of employment only if it is "persistent." Put another way, in May 2017 the employer informed Whittlesey and the other employees that, as long as no single employee in a "persistent" manner referred to Whittlesey in a racially offensive manner, then Whittlesey was required to continue to hear the racially offensive word if he wanted to be employed at this restaurant because no employee would be terminated for that behavior.

¶57 As a result, we reject the Commission's conclusion of law that "the import of the meeting, and the employer's objection to the use of the 'n' word, was evident." While the Commission acknowledges that the offensive word has no place at work, the Commission fails to recognize how the employer's failure to specifically prohibit the offensive language at the meeting is an insufficient reaction. If anything, the import of the meeting was so vague as to be almost meaningless if it was intended to address the problem of Whittlesey being subjected to offensive racial epithets at that restaurant.

¶58 To confirm the ineffectiveness of the mandatory meeting, the racially inappropriate comments did not stop after the May 2017 meeting. The poor result is established by the fact that, just eleven days after the meeting that was designed to fix this problem, another employee used the offensive racial epithet in the workplace. Two months after the meeting, it happened again.

¶59 Wisconsin unemployment compensation statutes require an employer to either agree to pay unemployment benefits to a person in Whittlesey's position or take effective steps to not have a person in Whittlesey's position subject to offensive racist language. This is shown by the case law's use of the term "omission" by the employer being a basis to award unemployment benefits. *See* ***Klatt***, 266 Wis. 2d 1038, ¶15. Here, by its ineffective response to the offensive racist language, the omission by the employer was both real and substantial. *See* ***id.***

¶60 The Commission erred in focusing solely on the employer's acts, and not considering the omissions of the employer. The mandatory meeting by the employer did not provide a meaningful deterrent. Accordingly, the omissions of

the employer support the conclusion that Whittlesey's voluntary termination was based on good cause attributable to the employer.

### E. Each Incident Was "Addressed" by the Employer.

¶61     The Commission concluded in its written decision that Whittlesey did not quit based on the fault of the employer because "each incident complained of was addressed by the employer's management or owners." The Commission did not explain in its decision what it meant by the term "addressed" in this situation. The Commission, in briefing in this court, attempts to change its findings and conclusions, and we reject those attempts.

¶62     The Commission contends on appeal that those persons who made the racist remarks were "disciplined/counseled" about their conduct by management or an owner. That purported fact is not in the factual findings of the Commission. Further, it is contradicted by a memo prepared by the employer. Regarding the remark about the comb made eleven days after the mandatory meeting, one of the owners memorialized in writing a meeting with the employee who made the remark and wrote: "I spoke with [] at approximately 2 pm on May 23rd regarding the allegation that she used the 'n' word the previous week. *I told her that she was not being written up and we were not accusing her of anything*." (Emphasis added.) The person who made the statement about the comb eleven days after the mandatory meeting was explicitly not disciplined and was not accused of anything by the owner of the employer. As a result, we fail to see how that racist remark was effectively addressed by the employer.

¶63     The findings of the Commission also state that none of the employees whose conduct was "addressed" repeated the conduct. From that, the Commission now argues on appeal that the "issues" were "corrected" by the time

Whittlesey quit. There is no basis to support the Commission's argument that the problems were "corrected."

¶64 Relatively shortly after the mandatory meeting, two employees felt comfortable using the offensive racial epithet at this workplace. Individual or group addressing of this issue obviously did not prevent the word from being used in the workplace. By the point at which Whittlesey quit, the racist language was reasonably seen by Whittlesey as a systemic, rather than an individual, issue at the restaurant. The failure to implement increasingly severe measures for this conduct cannot be deemed a "correction."

¶65 The Commission erred because it did not sufficiently consider the appalling nature of the racist language, the number of events, and the effect on Whittlesey as reasonably perceived by him. That none of the persons who previously used the offensive racist language repeated the language does not change that Whittlesey saw, reasonably so, that language as accumulating. The Commission's approach was to view each incident, in effect, in a silo. However, the complaints of Whittlesey regarding this language are related. Because it was a different employee with each incident does not mean that Whittlesey did not have good cause to quit based on the omissions of the employer. As stated by the Department, "[a]t what point was [Whittlesey] supposed to stop tolerating" these offensive racial slurs?

¶66 We conclude that, although there was an arguable attempt by the owner to "address" these racist remarks, the actions and omissions of the owner made any such attempt ineffective.

### F. Summary.

¶67    Wisconsin's unemployment compensation statutes do not create for any employer absolute liability for the actions or comments of its employees. However, Wisconsin's unemployment compensation statutes do not require an employee, such as Whittlesey, to be subject to racial epithets indefinitely. Those same statutes place an obligation on the employer to take reasonable steps to stop offensive racist remarks in the workplace of which the employer is aware.

¶68    Here, the cumulative effect of these offensive racist statements and the ineffectiveness of, and the omissions in, the response of the employer reasonably led Whittlesey to conclude that he would be subject to further offensive racist language if he continued to work at the restaurant. For those reasons, we conclude that Whittlesey's voluntary termination of his employment was with good cause that was substantial and real based on actions and omissions of the employer. Accordingly, we reverse the decision of the Commission.

¶69    We stress that our decision is based on the provisions of Wisconsin's unemployment compensation statutes applicable to this case and these unique facts and circumstances.

### CONCLUSION

¶70    For the foregoing reasons, we reverse the circuit court's order affirming the Commission's decision and remand this matter to the circuit court for remand to the Commission to reinstate Whittlesey's unemployment benefits.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.