**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 9, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2022AP1865**

STATE OF WISCONSIN

Cir. Ct. No.  2022CV972

IN COURT OF APPEALS
DISTRICT I

---

JONATHAN TODD MORRIS,

PLAINTIFF-APPELLANT,

V.

LABOR INDUSTRY AND REVIEW COMMISSION, WISCONSIN DEPARTMENT OF WORKFORCE DEVELOPMENT AND BREDAN MECHANICAL SYSTEMS, INC.,

DEFENDANTS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Milwaukee County: PEDRO A. COLÓN, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Geenen, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jonathan Todd Morris appeals the decision of the circuit court affirming the decision of the Labor and Industrial Review Commission (LIRC), which found him ineligible for unemployment insurance benefits due to "misconduct" connected with his employment. The Department of Workforce Development (DWD) issued an initial decision that found Morris ineligible for benefits because he was discharged for "substantial fault" connected with his work. Morris appealed to an administrative law judge (ALJ), sitting as an appeal tribunal, who affirmed DWD's decision but modified the basis for ineligibility from "substantial fault" to "misconduct." Morris petitioned for review of the ALJ's decision to LIRC, and LIRC affirmed.

¶2 Morris contends that LIRC erred when it affirmed the ALJ's determination that Morris was ineligible for benefits because he was discharged for "misconduct." He argues that several of LIRC's material factual findings were not supported by substantial and credible evidence and that LIRC erred in concluding that his actions constituted "misconduct." Morris further argues that the modification from "substantial fault" in the DWD decision to "misconduct" in the ALJ's decision denied him due process, and he was prejudiced by the ALJ's decision to exclude certain evidence at the appeal hearing. We disagree and affirm LIRC's decision.

## BACKGROUND

¶3 For fourteen years, Jonathan Todd Morris was the vice president of finance and operations for his employer, Bredan Mechanical Systems, Inc. (Bredan). Morris's primary responsibility was to assure the financial health of the company. Bredan terminated Morris's employment on October 26, 2020, the day

after he reported to Bredan that he lost at least $394,000 of the company's money over the course of the previous month in an internet-based wire transfer scam.

¶4    On September 17, 2020, Morris received an email that appeared to be from NTS IT Care (NTS), an internet technology service provider with which Bredan had previously done business. The email said that NTS was going to charge Bredan $399.99 for services unless Morris called to get the charge credited. Morris called the phone number listed in the email and spoke with Peter Tweed, who Morris believed worked for the provider, about the refund. Tweed told Morris that Morris needed to give him remote access to Morris's work computer and then log into Bredan's bank account so that he could walk Morris through the credit process. Morris complied, giving Tweed remote access and then logging into Bredan's Chase bank account with Tweed watching. When a dialogue box appeared on the screen, Tweed told Morris to type "$499.00" into the box—the $399 amount plus a $100 cancellation fee Tweed said NTS would "probably" charge—so that the credit request could be processed.

¶5    According to Morris, as he entered the credit amount, his computer screen went blank. When the screen turned back on moments later, Tweed asked Morris what he had done. Tweed claimed that Morris had not requested a credit but instead had transferred $49,999.99 of NTS's money into Bredan's account. Because Morris was still logged into Bredan's bank account, he could see that it showed a $49,999.99 deposit into Bredan's savings account.

¶6      Tweed was very upset but explained that Morris could correct the error by going to the bank to request a wire transfer of $49,400.[1]  Tweed gave Morris instructions for the wire transfer, which included the name of Tweed's bank—the Bank of Bangkok.  Tweed also told Morris that when he transferred the money to make sure that the reason for the transfer was listed as "personal family reasons."

¶7      Morris recognized while he was still on the phone and computer with Tweed that the transfer request was suspicious and likely illegal.  Morris testified that he became "concerned" that a foreign bank account was involved and suspected a possible money laundering scheme.  He further testified that he "just want[ed] to get [him]self the hell out of the loop[.]"  He added that by giving Tweed remote access to his computer, he placed Bredan's computers at risk of a ransomware attack.  Morris said that he complied with Tweed's requests in order to get Tweed off of his computer.

¶8      Even though Morris "knew it was a scam" or money laundering scheme, suspected that Tweed was not who he said he was, and feared Tweed could launch a ransomware attack against Bredan's computers and digital assets, Morris physically went to a Chase bank location and, after transferring $49,000 from Bredan's savings account to its checking account, wired $49,000 to Tweed's account.  While he recognized that Tweed was engaged in suspicious or illegal activity, Morris hoped that complying with Tweed's demands would resolve the situation.  It did not.

---

[1] The amount of the first wire transfer varies in the record, but the inconsistencies are minor and immaterial.

¶9      The next day, Tweed called Morris and said that the wire transfer never went through, and instead, more of NTS's money was deposited into Bredan's savings account. Tweed insisted that Morris reverse the deposit by sending two additional $49,000 transfers to two new bank accounts. Morris made those transfers on September 23, 2020. The pattern continued. Tweed would call with various excuses about wire transfer failures or inadvertent deposits, telling Morris to send new wire transfers of $49,000 each. Tweed's claims corresponded with entries in Bredan's Chase bank account showing credits to the savings account. Tweed also showed Morris bank statements that appeared to show these NTS deposits into Bredan's savings account. In reality and unbeknownst to Morris, the bank statements were falsified: the deposits had come from Bredan's own checking account, not NTS.

¶10     On Monday, September 28, 2020, after Morris had made six transfers totaling $294,000 from Bredan's checking account to Tweed's various bank accounts in Bangkok and Hong Kong, Tweed told Morris that they had been scammed, and the money had been stolen. Morris realized that all of the money he transferred was Bredan's money and that it had been stolen via the wire transfers. Tweed told Morris that the bulk of the funds were permanently lost and, after speculating that Morris would likely be fired for losing Bredan's money, Tweed suggested a way Morris could possibly obtain a partial refund.

¶11     Morris transferred yet *more* money to various overseas bank accounts over the next three weeks. Morris, with Tweed's help, recovered some funds—apparently a technique in furtherance of the scam—but proceeded to wire, and then lose, even more money than he recovered. Finally, and only after he lost his personal funds to the scam, Morris reported the scam to the FBI on or around October 17, 2020.

¶12    Morris did not notify Bredan of the scam or stolen money until October 20, 2020, at the earliest.  In total, Morris made nine wire transfers from Bredan's bank account, causing a financial loss to Bredan of at least $394,000. Tweed had access to Morris's work computer and bank account information for at least four weeks.

¶13    Bredan subsequently terminated Morris's employment.  Morris applied for unemployment insurance benefits from the DWD.  After completing its investigation, DWD issued its initial determination concluding that although Morris was not discharged for "misconduct," he was nonetheless ineligible for benefits because he had been discharged for "substantial fault" connected with his employment.

¶14    Morris appealed the determination, arguing that DWD's decision was internally inconsistent and in conflict with controlling law.  DWD issued notice of a hearing on the appeal.  The notice described the issue for hearing as:

> [Whether] the circumstances surrounding the employee's separation from employment … disqualify the employee from receiving unemployment benefits.  WIS. STAT. §§ 108.04(1)(b), (5), (5g), (7) & (7m) and WIS. ADMIN CODE § DWD 132 & 133[.]

¶15    An ALJ held a hearing on Morris's appeal.  Morris testified at the hearing, as did Bredan's CEO, Dan Rogers, and its president, Michael Gaggioli. The ALJ concluded that Morris was ineligible for benefits.  Specifically, the ALJ noted that Morris continued making large wire transfers after he knew that the employer's money had been stolen, did not notify his supervisors despite mounting losses, and that there was, therefore, no reasonable justification for Morris's conduct.    The ALJ determined that these actions constituted an

intentional and substantial disregard of Morris's duties and obligations to Bredan and satisfied the "general misconduct" standard.

¶16 Morris appealed the ALJ's decision to LIRC. He contended that his conduct could not be reconciled with the definition of "misconduct" under WIS. STAT. § 108.04(5) (2021-22).[2] LIRC disagreed and affirmed the appeal tribunal decision, finding that:

> The employee testified at the hearing that he was the victim of a scam and that he did not intentionally take money from the employer's accounts.… However, the employee felt, from the very first day, that the situation was a scam. He had allowed a third party access to the employer's computer and logged into the employer's bank account while the third party had remote access to the employee's work computer. The employee did not immediately inform the employer of his actions or his suspicions but continued to allow this stranger access to his work computer and the employee continued to wire large sums of money to foreign bank accounts. His actions in this regard were intentional and the decision not to immediately inform the employer of the problem was detrimental to the employer's interests. Further, the employee's actions in continuing to wire money to foreign banks in the hopes that an unknown individual would return the money was so negligent as to evince a willful and substantial disregard of the employer's interest as to amount to misconduct connected with his work.

¶17 Morris appealed LIRC's decision to the circuit court, which affirmed LIRC's decision. Morris now appeals LIRC's determination that he was ineligible for unemployment benefits due to "misconduct" connected with his employment.

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## DISCUSSION

¶18    Morris argues that several of LIRC's factual findings are not supported by substantial and credible evidence.  He further contends that LIRC erred when it concluded that the actions resulting in his termination constituted "misconduct" under WIS. STAT. § 108.04(5).  Finally, Morris raises two issues that he could have, but did not, raise on appeal to LIRC, including an alleged due process violation and several alleged evidentiary errors.[3]

### A.  Standard of review

¶19    On appeal, we review LIRC's decision, not the decision of the circuit court.  *Friendly Vill. Nursing & Rehab, LLC v. DWD*, 2022 WI 4, ¶13, 400 Wis. 2d 277, 969 N.W.2d 245.  Because we review LIRC's decision directly, we do not address Morris's claims regarding alleged circuit court errors.

¶20    Administrative decisions concerning unemployment insurance benefits are governed by Chapter 108 of the Wisconsin statutes.  A reviewing court may set aside LIRC's order if it depends on a material and controverted finding of fact not supported by credible and substantial evidence, or if it is otherwise issued in excess of LIRC's authority.  WIS. STAT. §§ 108.09(7)(f), 108.09(7)(c)6.a.; *Xcel Energy Servs., Inc. v. LIRC*, 2013 WI 64, ¶55, 349 Wis. 2d 234, 833 N.W.2d 665.  "LIRC's findings of fact are upheld if they are supported by substantial and credible evidence."  *Operton v. LIRC*, 2017 WI 46, ¶18, 375 Wis. 2d 1, 894 N.W.2d 426 (citations omitted).  Credible and substantial evidence

---

[3] Morris asks that this court "reverse and order that Mr. Morris be paid all state and federal supplemental unemployment benefits due him."  As a matter of law, however, this court's role is confined to affirming or setting aside LIRC's decision.  WIS. STAT. § 108.09(7)(c)6.

is that which is "sufficient to exclude speculation or conjecture" and is less demanding than proof by a preponderance of the evidence. ***Bumpas v. DILHR***, 95 Wis. 2d 334, 343, 290 N.W.2d 504 (1980). The burden of showing that LIRC's decision was not supported by credible and substantial evidence is on the party seeking to set aside LIRC's findings and order. ***Bretl v. LIRC***, 204 Wis. 2d 93, 99, 553 N.W.2d 550 (Ct. App. 1996).

¶21 LIRC's legal conclusions are reviewed de novo. ***Mueller v. LIRC***, 2019 WI App 50, ¶17, 388 Wis. 2d 602, 933 N.W.2d 645. We afford no deference to the agency's interpretation of law. WIS. STAT. § 227.57(11). However, in evaluating the persuasiveness of the agency's arguments, we will give "due weight" to LIRC's experience, technical competence, and specialized knowledge, as well as to the discretionary authority conferred upon it, while still exercising independent judgment in deciding the legal question.[4] Sec. 227.57(10); ***Tetra Tech EC, Inc. v. DOR***, 2018 WI 75, ¶78, 382 Wis. 2d 496, 914 N.W.2d 21.

### B. LIRC's findings of fact are supported by substantial and credible evidence.

¶22 LIRC's conclusion that Morris engaged in general misconduct within the definition of WIS. STAT. § 108.04(5) rested on a handful of key findings of fact that Morris argues are unsupported by credible and substantial evidence. We disagree.

---

[4] As required by ***Tetra Tech EC, Inc. v. DOR***, 2018 WI 75, ¶79, 382 Wis. 2d 496, 914 N.W.2d 21, LIRC "explain[ed] how its experience, technical competence, and specialized knowledge give its view of the law a significance or perspective unique amongst the parties, and why that background should make the agency's view of the law more persuasive than others." We agree, but we note that our decision would be the same whether or not "due weight" is given to LIRC.

¶23     First, Morris contends that LIRC concluded that Morris "suspected the scam itself" on day one.  It did not.  Morris testified that he suspected *a* scam, was suspicious of Tweed, and was "concerned" by the foreign bank account even before he made the first transfer.  He "knew it was a scam" or a money laundering scheme, even if he did not know it was *the* scam.  There is credible and substantial evidence that Morris suspected *a* scam on the first day.

¶24     Morris next argues that LIRC erred when it found that Morris knew he had repeatedly successfully wired money overseas.  Again, LIRC never made such a finding.  Morris changes LIRC's actual conclusion by adding "successful," but regardless, there is no dispute that by September 28, 2020, Morris knew that the transfers of Bredan's money were successful and that the money was stolen, yet he continued to make wire transfers after that date.

¶25     Morris also takes issue with LIRC's finding that he "repeatedly" gave Tweed access to his computer.  To the extent Morris did not *actively* give Tweed repeated access to his computer, he is correct.  However, Tweed did not have to repeatedly be granted access.  LIRC also found that Morris "continued to allow this stranger access to his work computer," and Morris admitted that Tweed did have access to his work computer on and after September 17, 2020, maintaining access throughout the duration of the scam despite Morris's claimed concern of preventing a ransomware attack.

¶26     Morris also argues that there is no evidence that he was required to immediately report any suspicious activity to management.  While this statement is correct, LIRC did not find otherwise.  Instead, it concluded that Morris's failure to immediately notify Bredan of the scam or Tweed's access to his work computer was detrimental to Bredan.  Morris also argues that *this* finding is not supported by

credible and substantial evidence, but we reject his assertion out of hand. Bredan lost $394,000 because of Morris's conduct, including $98,000 *after* Morris was told that the first $296,000 in wire transfers was stolen.

¶27 In sum, we conclude that the challenged LIRC findings are supported by substantial and credible evidence.

### C. LIRC correctly concluded that Morris's actions constituted "misconduct" under WIS. STAT. § 108.04(5).

¶28 Morris argues that LIRC erred when it found his actions constituted "misconduct" under WIS. STAT. § 108.04(5) because the record establishes that he did not act with "wrongful intent or evil design," but instead, acted in "good faith." Morris's understanding of "misconduct" is incomplete and specifically ignores the operative language of the statute relied upon by LIRC. We agree with LIRC that Morris's actions constituted "misconduct" disqualifying Morris from receiving unemployment benefits.

¶29 Although Wisconsin's unemployment compensation statutes embody a strong public policy in favor of compensating the unemployed, employees may be disqualified from receiving unemployment benefits under WIS. STAT. § 108.04. *Operton*, 375 Wis. 2d 1, ¶¶32-33. An employee may be disqualified from receiving unemployment benefits if their employment is terminated due to misconduct connected with their employment. Sec. 108.04(5). While misconduct usually involves intentional acts, the statute makes clear that unintentional conduct can also amount to misconduct. It defines "misconduct" as:

> [O]ne or more actions or conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which an employer has a right to expect of his or her employees, or in carelessness or negligence of such degree or recurrence as to manifest culpability, wrongful intent, or

11

> evil design of equal severity to such disregard, or to show an intentional and substantial disregard of an employer's interests, or of an employee's duties and obligations to his or her employer.

*Id*. "[A] recurrent pattern of negligent acts, so serious as to amount to gross negligence" can constitute "misconduct." *McGraw-Edison Co. v. DILHR*, 64 Wis. 2d 703, 712, 221 N.W.2d 677 (1974). It is the repeated nature of the negligent acts in disregard of the employer's interest that distinguishes gross negligence from "mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion," which is not "misconduct" sufficient to disqualify a terminated employee from receiving unemployment benefits. *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 260, 296 N.W. 636 (1941); *see also Operton*, 375 Wis. 2d 1, ¶¶43-46.

¶30 Morris argues that because he did not intend to become a victim of a scam when he made the first transfer on September 17, 2020, the "intent" requirement cannot be met to find "misconduct," but this framing of the issue misses the point and mischaracterizes the basis for LIRC's legal conclusion. To the contrary, the record demonstrates that Morris recognized from the very first day that something was off with the transaction; he testified that he suspected a scam (not *the* scam) or money laundering scheme. He also testified that he made the first wire transfer at least in part because he feared a ransomware attack after he gave Tweed access to his work computer, yet he made no effort to restrict Tweed's access. Morris continued to make wire transfers to foreign banks at Tweed's direction, citing "personal family reasons" for the transfers. Even after Tweed confirmed that nearly $300,000 was stolen less than two weeks into the scam, Morris transferred *more* money at Tweed's direction without telling

12

Bredan's ownership until several weeks later, after Bredan had suffered additional losses. This conduct is objectively unreasonable and actively disregards the employer's interests.

¶31 LIRC's findings of fact are supported by substantial and credible evidence. We agree with LIRC's conclusion that by "continuing to wire money to foreign banks in the hopes that an unknown individual would return the money," Morris's actions were "so negligent as to evince a willful and substantial disregard of [Bredan's] interest as to amount to misconduct connected with his work."

**D. Morris's remaining claims fail due to lack of prejudice.**

**1. Due process**

¶32 Morris argues that he was denied due process because the ALJ denied benefits on a different basis than the DWD, and for a different reason than the one Bredan cited when it terminated his employment. Specifically, Morris complains that "at no time before the ALJ's June 26, 2021 Decision had [he] ever been notified that he did not qualify for benefits because he was expected to promptly report any suspicious activity to management and had failed to report the scam to management quickly enough."[5]

¶33 "The fundamental requirements of procedural due process are notice and an opportunity to be heard." ***Zimbrick v. LIRC***, 2000 WI App 106, ¶10, 235 Wis. 2d 132, 613 N.W.2d 198 (citation omitted). The notice must be reasonably calculated to inform the person of the pending proceeding and to afford them an

---

[5] Although Morris's due process claim could be deemed forfeited by his failure to raise the issue before LIRC, we nonetheless reject his claim on the merits. *See* **State v. Ndina**, 2009 WI 21, ¶¶28-30, 315 Wis. 2d 653, 761 N.W.2d 612.

13

opportunity to object and defend their rights. *Id.* Here, because the notice issued by DWD included whether Morris was terminated for "misconduct" under WIS. STAT. § 108.04(5) as an issue for hearing before the ALJ, we are not persuaded that notice was inadequate or violated due process.

¶34 However, even if a notice is insufficient, reversal of the commission decision based on a due process violation for insufficient notice requires a showing of prejudicial error. *Zimbrick*, 235 Wis. 2d 132, ¶18. Thus, a reversal of LIRC's decision based on a due process violation for insufficient notice "at least requires a showing that the ALJ did not have all of the relevant evidence before him in the record (which would include relevant testimony from claimant), or that the ALJ did not consider all of the evidence in the record in reaching his decision." *Id.* (citation omitted).

¶35 Morris has not identified any relevant evidence or argument he could have offered or that the ALJ did not consider due to lack of notice. The evidence Morris does identify—a copy of a statement that Bredan made to DWD during the initial investigation—is not part of the hearing record,[6] and in any event, the statement contradicts Morris's argument because it identifies as among the reasons for Morris's termination was that "he failed to inform the owner of the wire transfers for over 30 days." Accordingly, we reject Morris's due process claim.

---

[6] "A party is precluded from offering evidence he failed to offer before the commission." *Weibel v. Clark*, 87 Wis. 2d 696, 708, 275 N.W.2d 686 (1979); *Kenwood Merch. Corp. v. LIRC*, 114 Wis. 2d 226, 236, 338 N.W.2d 312 (Ct. App. 1983).

### 2. Evidentiary issues

¶36 Morris's final argument is that the ALJ made a series of evidentiary errors, including: (1) refusing to allow him to testify about his post-termination offers to help Bredan with their investigation into the scam; (2) refusing to allow him to testify about certain details of an earlier ransomware attack Bredan experienced to shed light on Morris's concern about a new ransomware attack by Tweed; and (3) refusing to admit and view a YouTube video about how the purported scam worked. Morris argues that because the refused evidence was relevant to his "intent" and "good faith" in dealing with Tweed, it is therefore relevant to the misconduct standard. However, aside from Morris's conclusory statement that the ALJ's refusal to allow the evidence was plain and reversible error and highlighting that there was no objection to the rejected evidence, Morris provides no legal support for his claims and fails to sufficiently allege that the ALJ's evidentiary rulings harmed him.[7]

¶37 The lack of a party's objection to evidence does not make evidence admissible. Appeal tribunals have a duty to secure the facts in as direct and simple a manner as possible. WIS. ADMIN. CODE §§ DWD 140.15(2) and 140.16(1). Evidence having reasonable probative value is admissible, but irrelevant, immaterial, and repetitive evidence is not. WIS. ADMIN. CODE § DWD 140.16(1).

¶38 Our review of the record does not support Morris's conclusion that the ALJ committed any error, let alone plain or reversible error. The ALJ disallowed details of the prior ransomware attack, which were not relevant to

---

[7] Like his due process argument, Morris could have but did not raise these evidentiary issues before LIRC, and therefore, the issues could be deemed forfeited. *See **Ndina***, 315 Wis. 2d 653, ¶¶28-30. Nonetheless, we reject Morris's evidentiary issues on the merits.

Morris's termination, but allowed his testimony about the fact that such an attack occurred. That Morris offered his services to Bredan after he was terminated is also not relevant to or probative of the circumstances surrounding the termination.

¶39 Morris argues that the details about a past ransomware attack and his post-termination cooperation with the employer are relevant to his intent and the "good faith" nature of his actions, and that the YouTube video provided an explanation of the scam. However, the record reflects that Morris offered other testimony that covered these bases, rendering any error in the ALJ's evidentiary rulings harmless.

¶40 By statute, we disregard any irregularity or error of the commission unless Morris was damaged by it. WIS. STAT. § 108.09(7)(dm). Morris offered other evidence about his intent and justifications for his conduct, and the ALJ heard about the existence of a previous ransomware attack. The exclusion of the YouTube video is equally harmless because Morris explained how the scam worked in great detail based on his personal experience having fallen victim to it. Thus, even if we accept that the challenged evidentiary rulings were all erroneous, we conclude that Morris suffered no harm as a result. LIRC's conclusions that Morris committed misconduct when he did not notify his employer about the scam until all of the money was lost and that he had allowed a third party access to the employer's computer, creating the risk of a ransomware attack, are not undermined by the ALJ's alleged errors.

## CONCLUSION

¶41 For the foregoing reasons, we conclude that: (1) LIRC's factual findings are supported by substantial and credible evidence; (2) LIRC correctly applied the law to the facts in concluding that Morris was terminated for

"misconduct"; and (3) Morris was not harmed by any alleged due process violation or evidentiary errors.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

17